[Civ. No. 25896. Second Dist., Div. Four. May 18,.1962.]

THE PEOPLE ex rel. THE STATE PARK COMMISSION, Plaintiff and Appellant, v. CLINTON T. JOHNSON et al., Defendants and Appellants.

Stanley Mosk, Attorney General, Howard S. Goldin, Assistant Attorney General, N. B. Peek and Warren J. Abbott, Deputy Attorneys General, for Plaintiff and Appellant.

Irving & Kellogg, Leslie W. Irving and Scott D. Kellogg for Defendants and Appellants.

BALTHIS, J.—Both plaintiff and defendants appeal from a judgment in a condemnation proceeding after a trial by jury which fixed the value of defendants' property to be acquired by plaintiff.

Plaintiff alleges three errors were committed by the trial court which were prejudicial to the state. The issues raised are:

1. Did the trial court commit prejudicial error in allowing an architect-consultant to state the value of the subject property based on his feasibility study?

2. Did the admission of the sales of other properties, alleged to be noncomparable, constitute prejudicial error?

3. Did the trial court commit prejudicial error by its remarks in the presence of the jury?

Defendant appeals from the judgment on only one issue, namely: Did the trial court err in not allowing interest from a date prior to the entry of judgment?

On April 3, 1958, the State Park Commission in the name of the People of the State of California filed a complaint in eminent domain seeking to condemn the property owned by defendants Clinton T. Johnson and Eva G. Johnson located in the City of Pismo Beach, County of San Luis Obispo, for state park purposes, to wit, for the extension and improvement of Pismo Beach State Park. After a trial upon the legal issues in which the court found for the plaintiff, a trial upon the issue of just compensation was held before a jury on September 15 through September 30, 1960. The jury found the value of the subject property as of April 3, 1958, was $130,953 and judgment in condemnation for that sum plus costs was entered. The judgment provided that interest thereon was to run from the date of entry of judgment until the date of deposit of the award.

The subject property is primarily a private sandy beach located in the City of Pismo Beach within a few hundred feet of the Pismo Pier. It is vacant and zoned for commercial use. The width of the subject property is approximately 557 feet. Its depth varies depending on the location of the ever-changing ordinary high tide line and could not be fixed with certainty on the condemnation date.

Defendants' first witness was John Badgley, an architect and planning consultant. Badgley made a "feasibility" study of the subject property complete with schematic diagrams for the sole purpose of showing that the land could be physically and economically adapted to his envisioned project which included a resort motel with swimming pool, restaurant and lounge bar. Badgley's plans utilized a building technique, a "floating foundation," which would eliminate the need for expensive sea walls. Certain figures were introduced over plaintiff's objections in connection with Badgley's economic feasibility study.

The court first sustained plaintiff's objections to the giving of any future income figures emanating from Badgley's study because of the speculation involved. The court then asked Badgley over plaintiff's objections what a purchaser could pay for the property consistent with the feasibility plan presented. Badgley then testified that, using an average of

three accepted ways of determining feasibility, an amount of $728,000 could be paid for the land. The court then read the standard and accepted definition of fair market value to Badgley and asked whether the land could sell for that amount. Badgley declined to give any estimation of fair market value because as he stated: "Your Honor, I am not a real estate appraiser, and that is not my concern." He was only concerned with the "reasonable economic value" in answering a client's question of "what can I afford to pay for this; what can I expect to pay for it and still make economic ends meet."

Plaintiff moved to strike out the part of the testimony giving the price someone could pay for this land but this motion was denied. The court then stated: ". . . the whole question is whether, if it was placed on the market for a reasonable time it would be—there would be a purchaser who has something like this in mind. It might not come to Mr. Badgley, I don't— but the definition is approximately as I have read it. To me that is the way we determine fair market value. The jury can take all of these things into consideration; give it what weight you feel it is entitled to."

On cross-examination Badgley stated that he arrived at the figure mentioned through a study of the potential income from the unit he designed.

The trial court erred by admitting into evidence testimony concerning the specific dollar value of the land, to wit, $728,000 for a specific project. However, all of the testimony regarding the adaptability of the land for that purpose was proper.

The rule and the reasons therefore are clearly stated in the leading case, *Sacramento etc. R. R. Co.* v. *Heilbron*, 156 Cal. 408, 412 [104 P. 979], as follows: ". . . this court by its latest utterances has definitively aligned itself with the great majority of the courts in holding that damages must be measured by the market value of the land at the time it is taken, that the test is not the value for a special purpose, but the fair market value of the land in view of all the purposes to which it is naturally adapted; that therefore while evidence that it is 'valuable' for this or that or another purpose may always be given and should be freely received, *the value in terms of money, the price, which one or another witness may think the land would bring for this or that or the other specific purpose is not admissible as an element in determining that market value.* For such evidence opens wide the door to unlimited

vagaries and speculations concerning problematical prices which might under possible contingencies be paid for the land, and distracts the mind of the jury from the single question—that of market value—the highest sum which the property is worth to persons generally, purchasing in the open market in consideration of the land's adaptability for any proven use." (Italics ours.)

The *Heilbron* rule has been followed in the later cases. In *Oakland* v. *Pacific Coast Lumber etc. Co.*, 171 Cal. 392 [153 P. 705], the court said (pp. 399-400) : "Appellant 'takes exception' to the language of this court in the *Heilbron* case to the effect that the value in terms of money which a witness might think the lands would have for some speculative use to which it was not put, and to which it might never be put, was not legitimate evidence. In the *Heilbron* case this court was not dealing with the question of the value of land as evidenced by a present use, but solely with the problematical values sought by the witnesses to be put upon the land for problematical uses. If the exception to the exclusion of this kind of evidence is well taken, then it would be quite permissible for the witnesses to say, 'if oil were discovered upon the land it would be worth twenty thousand dollars an acre,' 'if a gold mine were discovered upon it it would be worth ten thousand dollars an acre,' 'if a man wanted to buy it and establish a town site it would be worth three thousand dollars an acre,' and so on, until such inquiry in a condemnation suit would bear a close affinity to Lord Dundreary's famous question, 'If you had a brother would he like cheese?' "

In *Long Beach City High School Dist.* v. *Stewart*, 30 Cal. 2d 763 [185 P.2d 585, 173 A.L.R. 249], a witness in the condemnation proceeding was being interrogated concerning the value of the land "for an industrial purpose." The Supreme Court held "[s]uch evidence was clearly inadmissible." (P. 771.)

That evidence of value, based upon a specific use or upon an owner's projected plan, is not admissible, see also *Laguna Salada etc. Dist.* v. *Pacific Dev. Co.*, 119 Cal.App.2d 470, 476 [259 P.2d 498] ; *East Bay Mun. Utility Dist.* v. *Kieffer*, 99 Cal. App. 240, 250-251 [278 P. 476, 279 P. 178] ; *City of Stockton* v. *Vote*, 76 Cal.App. 369, 402-403 [244 P. 609]. For an out of state case in point, see *State of Louisiana* v. *Hub Realty Co.* (1960) 239 La. 154 [118 So.2d 364, 369].

We believe the error committed here in permitting Badgley to testify as to the speculative value of $728,000 was

prejudicial. The state's two appraisers testified that the property had a fair market value of $18,000 and $20,000 respectively. Defendants' appraisers testified to market values ranging from $400,000 to $445,000. The jury's verdict was for compensation in the sum of $130,953.

Even though the jury was instructed on market value we cannot overlook the possibility that the jury was misled and confused by Badgley's testimony. The jury might well have believed that his statement of valuation was not speculative but rather was an opinion of market value entitled to great weight in their determination of fair market value.

A second issue on appeal is whether or not it was error for the court to admit evidence as to the sale prices of two motel properties claimed by defendant to be comparable. Mr. Quinn, a real estate broker from Santa Barbara, testified for defendants that in his opinion the highest and best use of the subject property was for ". . . motel apartments, combination with restaurant and cocktail lounge and possibly some one or two small shops in the building." He testified as to certain sales that took place. Over objection on the ground of noncomparability he testified concerning a sale of the Edgewater Motel. This parcel was improved with an established and functioning motel. He gave the sale price of $350,000 and then gave the calculation he made to determine the land value. In response to a question by the court he stated that in his opinion the land value of this parcel was $124,790. Again, over the objection of noncomparability, he stated the sale price ($180,000) and calculations made to determine land value ($55,000) of the Seawall Motel. The price of a second sale of this same property was admitted over the same objection.

The case of *County of Los Angeles* v. *Faus*, 48 Cal.2d 672 [312 P.2d 680], reversed a long line of cases by holding that evidence of sale prices of comparable properties is admissible on direct examination. In holding that evidence of such sales is admissible, the court declared that certain limitations or "safeguards" are to be recognized, approving the quotation from McCormick on Evidence (1954), section 166, page 348, as follows: "These safeguards are the following: The sales of the other tracts must have been sufficiently near in time, and the other land must be located sufficiently near the land to be valued, and must be sufficiently alike in respect to character, situation, usability, and improvements, to make it clear that the two tracts are comparable in value

and that the price realized for the other land may fairly be considered as shedding light on the value of the land in question. Manifestly, the trial judge in applying so vague a standard must be granted a wide discretion.''

 It is recognized, of course, that the trial court has wide discretion to determine what are "comparable properties'' (*County of Los Angeles* v. *Faus, supra,* 48 Cal.2d 672, 678; *Covina Union High School Dist.* v. *Jobe,* 174 Cal. App.2d 340, 350 [345 P.2d 78]).

In *Covina Union High School Dist.* v. *Jobe,* 174 Cal.App.2d 340 [345 P.2d 78], the court said (p. 350) : "There can be no absolute formula or definition of what constitutes similar or like property. Certainly, similar does not mean identical. It appears to us that the determination must vary with each particular case. The *Faus* case, *supra,* mentioned the items of time, location, character, situation, usability and improvement.''

 In the instant case, the property being condemned is private, unimproved, sandy beach. The evidence here, admitted over objection, related to sales of existing, improved motel properties.

In our opinion, the admission of such evidence in the instant case does not recognize the "safeguards'' mentioned in the *Faus* decision and does not come within the reasonable limitations of "comparable sales.'' Here we have the attempted comparison of unimproved vacant land with improved, going business properties. There is no present similarity as to improvements, size or income. Because the alleged comparables have substantial improvements located upon them, it becomes immediately necessary for the real estate expert to separate the land values from the improvement values, sometimes not an easy or scientific task.

We are of the opinion that because of the great lack of similarity and the difficulties involved any evidence of the sales of such alleged "comparables'' would have little, if any, value and would be more apt to mislead than to assist the jury in its determination of fair market value.

In *County of Los Angeles* v. *Bean,* 176 Cal.App.2d 521 [1 Cal.Rptr. 464], the defendant sought to introduce evidence of other sales on the ground of comparability. The appellate court held such evidence inadmissible, saying at page 528: "The record in this case discloses no comparability. To the contrary, the dissimilarity is manifest. Other properties referred to by appellant contained producing wells with full

equipment. Appellant's well had not produced for over 20 years and had no producing equipment.''

The error in the instant case in admitting such evidence as to sales of noncomparable properties was also prejudicial to the appealing party (plaintiff) and such error was cumulative and reinforces our previous conclusion that the errors committed were prejudicial.

As a third point on appeal plaintiff contends that certain remarks made by the trial court in the presence of the jury were prejudicial. Plaintiff specifically complains of two series of remarks during the testimony of plaintiff's two valuation experts.

In the first series of remarks while the state's appraiser was on the stand the trial judge commented that the opinions of the appraisers were usually too high or too low, saying: ''I always hope that all appraisers, and that includes the defendants' as well as the plaintiff's, that they don't appraise on one side or the other but give us a fair picture for the jury, but unfortunately we get it, usually, the appraisers for the defendant as [sic] high and usually those on the condemnors are low, I don't know why. I get it that way all the time.''

Such a remark is, of course, improper while the appraiser for one side or the other is on the stand. It might well indicate to the jury that the judge believed the appraiser on the stand was either too high or too low in his appraisal. Furthermore, it might well encourage the jury, with apparent court approval, to bring in a split or compromise verdict. This tends to reward the side whose appraisers have ''stretched'' their opinions as to value.

The second series of remarks by the judge, also made during the testimony of one of the state's appraisers, has to do with the defendants being unwilling sellers. During the examination of the state's appraiser, Mr. Mason, in the presence of the jury, the court twice commented to the effect that Mr. Johnson was an unwilling seller. The discussion between the judge and Mr. Mason is set forth in the footnote.[1]

---

[1] ''Q. [The Court] What we are trying to do here, and what I suppose you are keeping in mind, is to find what is the just compensation due Mr. Johnson for this property. A. Yes.

''Q. This is his private property. He doesn't want to sell it. The State is taking it, and he is entitled to just compensation. . . .

'' . . . . . . . . .

''The Court: You see, this condemnation presents a serious problem and we are desperately trying to find out what is just, fair and just compensation to be paid Mr. Johnson. That is what we are concerned with mostly, and you have got to get all the evidence we can and all

These remarks of the court were likewise misleading because they are in conflict and inconsistent with the standard to be used by the jury in its determination of fair market value.

The law is well settled in this state that the concept of market value to be awarded in a condemnation action assumes a willing seller and a willing buyer.

"In a condemnation proceeding the measure of damages is the market value of the parcel taken. . . . Market value is the price that would be paid by *a willing* purchaser from a willing seller purchasing with a full knowledge of all the uses and purposes for which the property is reasonably adapted. It is hornbook law that it is market value that is involved, and not the value to the owner or to the condemner. . . ." (Emphasis added.) (*City of Daly City* v. *Smith* (1952), 110 Cal.App.2d 524, 531 [243 P.2d 46]; see also *Central Pac. Ry. Co.* v. *Feldman* (1907), 152 Cal. 303, 309 [92 P. 849]; *People* v. *Vinson* (1950), 99 Cal.App.2d 100, 102-103 [221 P.2d 161].)

"The plaintiff was entitled to have the actual market value established in accordance with law, unaffected by any belief or suggestion that the property was being wrongfully condemned and taken" (*City of San Diego* v. *Cuyamaca Water Co.*, 209 Cal. 152, 168 [287 P. 496].)

In the instant case these remarks made by the trial judge on this subject gave the erroneous impression to the jury that they were to consider the unwillingness of the owners to sell the subject property in reaching their verdict.

While the remarks of the court mentioned above were undoubtedly improper it is not clear that standing alone they would be sufficiently prejudicial to require a new trial. The prejudicial effects of such remarks may have been overcome

---

the advice we can about that it is. Mr. Johnson doesn't want to sell, but it is taken in the power of condemnation. Now, what is fair and just compensation? It isn't something like mathematics where two times two equals four or anything like that. We have a lot of testimony in here, including yours, and yet you probably haven't been able to pinpoint any—of as far as you are concerned, but there have been others that are different—see what I mean? If you are on the jury, you would squirm around because they have a serious problem to consider. A. Yes, they do, Your Honor. Do I understand that I am to consider that this property is being taken against his will? Is this a factor that I consider in arriving at my value?

"Q. He hasn't been able to sell it. They come before the Court and before a jury to determine a price. Now if he wanted to sell it and they wanted to buy it and they could agree on a price, yes, but they haven't done that. So, you are to consider that there is a controversy here between what he thinks is the value or what he would sell it for and what the state thinks it is worth. That is the reason you are here."

by instructions to the jury. In the instant case we have already noted other prejudicial errors and hence any error in the remarks made by the court were cumulative.

## DEFENDANTS' APPEAL

Defendants appeal from only that part of the judgment which denied them interest on the judgment from May 9, 1951.

On or about May 9, 1951, plaintiff filed an action seeking to condemn the subject property. Plaintiff did not proceed with the action to acquire the property and defendants' motion to dismiss the action was granted on November 26, 1956. Plaintiff was still desirous of obtaining this beach property to connect the portions of the Pismo State Beach on either side of the subject property and the instant action in eminent domain was commenced on April 3, 1958.

Defendants contend that "the public has used the subject property since May 9, 1951, rent free," that "the state had 'clouded' the title to the subject property since May 9, 1951, the date of the filing of the state's first action in eminent domain to acquire the subject property."

Defendant reaches the conclusion that there has been a public user for this period by virtue of the fact that the general public has been using the beach property in the same manner as it uses the adjoining state beaches and that such user would continue in the same manner after the state had acquired the property. This argument is entirely without merit and unsupported by the case law in this jurisdiction.

The rule is that interest on the judgment commences to run on the date the interlocutory judgment (*Bellflower City School Dist.* v. *Skaggs,* 52 Cal.2d 278 [339 P.2d 848]) or final judgment is entered. The right to interest "springs from the judgment." (*Capistrano Union High School Dist.* v. *Capistrano Beach Acreage Co.,* 188 Cal.App.2d 612, 616 [10 Cal. Rptr. 750].)

However, where an order of possession is obtained (*Metropolitan Water Dist.* v. *Adams,* 16 Cal.2d 676 [107 P.2d 618]) or there is damage to the property before judgment (*Heimann* v. *City of Los Angeles,* 30 Cal.2d 746 [185 P.2d 597]), interest is allowed from the earlier date in order to give the property owner the "just compensation" to which he is entitled. Such is the rule as recently codified by the amendment of section 1255b of the Code of Civil Procedure in 1961.

Defendants have tried to bring themselves within the line

of cases which allows interest from a date prior to the entry of judgment because of the alleged "taking" by the state from 1951 to the date of judgment.

Defendants contend that the fact that there was a condemnation action filed in 1951 and that the subject property was included in a master plan for the development of Pismo Beach State Park during the entire period "clouded" their title. This same contention was raised in *Los Angeles* v. *Gager*, 10 Cal.App. 378, 381-382 [102 P. 17], where the court, quoting from *Shoemaker* v. *United States*, 147 U.S. 282 [13 S.Ct. 361, 37 L.Ed. 170], said: " 'It is true that, by the institution of proceedings to condemn, the possession and enjoyment by the owner are to some extent interfered with. He can put no permanent improvements on the land, nor sell it, except subject to the condemnation proceedings. But the owner was in receipt of the rents, issues and profits during the time occupied in fixing the amount to which he was entitled, and the inconveniences to which he was subjected by the delay are presumed to be considered and allowed for in fixing the amount of the compensation. Such is the rule laid down in cases of the highest authority. [Citing cases.]'

"Until a citizen is deprived of possession of the property sought to be condemned, his right to the use and enjoyment thereof as it stood at the time of commencing the action is in no wise abridged. Therefore, it cannot, in a legal sense, be said that he is damaged until the actual taking of the property."

 In the instant case there was no "taking" of the property by the State Park Commission prior to entry of judgment. Although defendants' offer of proof to show a taking was denied, the evidence offered shows that it was the bathing public which used the beach and not the State Park Commission. The cases of *Ackerman* v. *Port of Seattle*, 55 Wn.2d 400 [348 P.2d 664], and *Griggs* v. *County of Allegheny* (1962) 369 U.S. 84 [82 S.Ct. 531, 7 L.Ed.2d 585], relied upon by defendants are not analogous to the instant case. In those cases there was found a "taking" by low flying airplanes, making the property at the end of the flight paths uninhabitable. In the instant case defendants had the power to exclude the trespassing public. The fact that defendants did not follow this course will not serve to obligate plaintiff for the payment of interest on the condemnation award.

Because of the errors which occurred and which are mentioned above the judgment is reversed and the case remanded

for a new trial on the issue of the damages to be awarded to the defendants.

As to costs on appeal, the principal appeal has been taken by the state; the appeal by defendants has involved only one point. Plaintiff is to bear all of its costs on appeal and seventy-five per cent (75%) of defendants' costs on appeal; defendants are to pay twenty-five per cent (25%) of their own costs on appeal.

Burke, P. J., and Jefferson, J., concurred.

A petition for a rehearing was denied June 6, 1962, and the petition of defendants and appellants for a hearing by the Supreme Court was denied July 11, 1962.