[Civ. No. 11560. Fourth Dist., Div. Two. Apr. 17, 1972.]

CITY OF ONTARIO, Plaintiff and Appellant, v.
MIKE KELBER, Defendant and Respondent.

## COUNSEL

Lynn W. Kloepfer, City Attorney, Philip F. Lanzafame for Plaintiff and Appellant.

Redwine & Sherrill and Justin M. McCarthy for Defendant and Respondent.

## OPINION

**KERRIGAN, J.**—On July 18, 1968, the City of Ontario (plaintiff) commenced this proceeding in eminent domain to condemn 20.014 acres of land owned by Mike Kelber (defendant) for airport purposes in connection with the improvement and expansion of Ontario International Airport. The part taken constitutes a part of a larger parcel consisting of 66.424 acres. During the pleading and pretrial stages of the proceeding, the issues involved the fair market value of the 20 acres, together with severance damages and special benefits accruing to the remaining 46 acres. On the date of trial, the parties stipulated that the sole issue to be resolved was the fair market value of the 20 acres. The valuation date was fixed at May 4, 1970—the day the trial started. Kelber's two appraisers valued the 20 acres at $1,171,404 and $1,075,525. Kelber valued them at $2,000,000. Ontario's two appraisers stated the 20 acres had a value of $500,350 and $480,336. Following a three week trial, the jury awarded Kelber the sum of $1,150,000 for the subject property and the city appeals.

In seeking a reversal of the judgment, the city maintains that the trial judge committed the following prejudicial errors: (1) In refusing to admit into evidence as an exhibit the plan of the proposed development of the public improvement, to wit, the *project plan,* or *master plan,* depicting the *after condition* of the Ontario Airport; (2) in admitting into evidence other airport leases relied upon by one of the owner's experts (E. R. Metcalfe) in forming his opinion of the fair market value of the 20 acres; and (3) in limiting the cross-examination of the owner's other expert (Verne Cox).

The city has owned and operated the Ontario International Airport, a major airport facility, for many years. In its *before condition,* the airport primarily consisted of a terminal with two takeoff and landing strips: a 10,000-foot runway running in a generally easterly-westerly direction, which served large commercial air carrier needs; and a 4,750-foot diagonal

runway, running southwesterly to northeasterly, which accommodated smaller aviation craft.

Kelber acquired his 66 acres in 1964. It adjoined or was contiguous to the south side of the airport. Kelber's north property line was situated 800 feet from the main 10,000-foot runway, and provided him with 1,300 feet of frontage bordering on the airport.

For some inexplicable reason, the city granted Kelber an easement of aircraft access directly from his property to the runways in 1966. The recorded easement provides for the legal right of two taxiways, 200 feet in width, between Kelber's property and the Ontario Airport runways. The easement rights enured to the entire 66 acres. Consequently, Kelber's property became extraordinarily unique in that it was the only large parcel of property in California (perhaps in the entire nation) which was *privately* owned, substantially free of zoning restrictions, bordering on a major airport, and benefiting from a clearly defined easement providing direct aircraft access to a major airport.

In 1967 Ontario entered into a Joint Powers Agreement with the City of Los Angeles, which contemplated the expansion and improvement of Ontario Airport. Pursuant to the agreement between the two municipalities, a proposed plan for the development of the Ontario Airport was formulated. This plan of the proposed public improvement received the tentative approval of the Federal Aviation Administration. Under said project plan, the main east-west runway was to be lengthened by another 1,700 feet, and a parallel 10,000-foot runway was to be constructed 700 feet south of the existing main runway; taxiways were to be constructed on either side of both runways; the terminal was to be expanded and other construction was to be undertaken. In order to construct the new runway and aforesaid taxiways, it would be necessary for Ontario to acquire additional land along the south boundary of the airport. In accordance with the objectives contained in the master plan of development, Ontario commenced condemnation proceedings against Kelber and others to acquire the additional land necessary for the expansion of the airport.

At the commencement of trial, to wit, immediately after the jury had been impaneled, counsel informed the court that they wanted to obtain some preliminary evidentiary rulings before making opening statements and putting on evidence in the jury's presence. An *in camera* session was held in which Bert J. Lockwood, Assistant General Manager of Operations for the City of Los Angeles, Department of Airports, was called as a witness. Following foundational testimony, an aerial photograph of Ontario International Airport was admitted in evidence. A diagram depicting the *before condition* of the Ontario International Airport was also

admitted in evidence. This diagram may be characterized as a map portrayal of the airport. It depicts the existing facilities, including the terminal, the main runway, the diagonal runway, the 20 acres to be taken, the 46 acres constituting the remainder, as well as the future airport boundaries. However, when counsel for the condemning agency sought to introduce a diagram or map portrayal depicting the *after condition* of the airport, the owner's counsel objected to its admission on the ground that the *after map* was irrelevant to the issue of the fair market value of the land taken, and that it further showed improvements on the condemnor's land which were also irrelevant to the issue to be decided. The court took the objection under submission and allowed further foundational testimony from Lockwood as to the admission of the master plan. Lockwood indicated that the specific purpose of taking Kelber's 20 acres was possibly to build a taxiway adjoining the new south runway, but he could not be sure whether the "take" was to construct the runway or taxiway or both, and that no definite statement could be made as to the precise use of Kelber's property until final F.A.A. approval could be obtained, and such approval would only be forthcoming when Ontario had actually acquired the land necessary for expansion and was ready to start construction. However, Lockwood was unequivocal in stating that the purpose of the "take" was for airport purposes. He was also confident that the easement of access rights acquired by Kelber from the city in 1966 was unaffected insofar as the remaining 46 acres were concerned—in other words, the easement inured to the remainder and was not being condemned. The owner's attorney renewed his objection to the admission of the project plan. The attorney for the condemning agency argued, in effect, that the master plan should be admitted for the edification of the jury. The court ruled that the master plan depicting the *after condition* of the airport was inadmissible. Proceedings then resumed before the jury.

Ontario's first contention on appeal is that the trial court erred in excluding from evidence the plan of the proposed development. The city maintains that the project plan was admissible under the Evidence Code and the court's refusal to admit it precluded the jury from having a clear picture of the *before condition* and *after condition* of the property.

Section 813 of the Evidence Code provides as follows:

"(a) The value of property may be shown only by the opinions of:

"(1) Witnesses qualified to express such opinions; and

"(2) The owner of the property or property interest being valued.

"(b) *Nothing* in this section *prohibits* a view of the property being valued or the admission of any other *admissible evidence* (including but not limited to evidence as to the nature and condition of the property and, *in an eminent domain proceeding, the character of the improvement proposed to be constructed by the plaintiff)* for the limited purpose of enabling the court, jury, or referee to understand and weigh the testimony given under subdivision (a); and such evidence, except evidence of the character of the improvement proposed to be constructed by the plaintiff in an eminent domain proceeding, is subject to impeachment and rebuttal." (Italics added.)

Ontario does not contend that evidence of the *after condition* of a public improvement is always admissible, nor does an analysis of section 813 support such an assertion. Subsection (b) of section 813 provides only that certain evidence, if otherwise admissible, is not precluded from admission into evidence by the rules of subsection (a). In other words, evidence of the *after condition* of a proposed public improvement must meet all of the normal criteria for admission, including (1) being relevant to an issue involved in the litigation (Evid. Code, §§ 350, 351), and (2) having probative value which shall substantially outweigh the probability that its admission will create a danger of undue prejudice or of misleading the jury. (Evid. Code, § 352.)

The most common situations in which *after condition* maps or diagrams are admissible in eminent domain cases are those where severance damages and special benefits are issues in the lawsuit. (See *People* ex rel. *Dept. P. W.* v. *Schultz Co.,* 123 Cal.App.2d 925, 932-934 [268 P.2d 117].) Inasmuch as Kelber waived any claim for severance damages to the remaining 46 acres, at first blush it would appear that the trial court acted with propriety in rejecting the master plan for the development of Ontario Airport from admission in evidence. However, the city makes the argument that the plan was relevant to the issue of whether the valuation of Kelber's property, as reflected in the testimony of his expert witnesses, was partially based on considerations of project enhancement accruing to the property by reason of the proposed improvements of Ontario Airport. Since 1888, it has been the law of California that a jury is precluded from including in an eminent domain award *any* increase in value to the owner's property attributable to the proposed improvement, i.e., project enhanced value. (*San Diego Land etc. Co.* v. *Neale,* 78 Cal. 63, 74-75 [20 P. 372].) The Supreme Court has made it clear that this is still the rule as to project enhancement value which accrues after it appears reasonably likely that defendant's property will be included in the public improvement (see *Merced Irrigation Dist.* v. *Woolstenhulme,* 4 Cal.3d 478 [93 Cal.Rptr. 833, 483 P.2d 1]). But the same court carved out one exception, to wit, where the condemner first releases a plan under which

it does not appear that defendant's property will be taken, but subseqently changes the plan so as to include the taking of defendant's property, then defendant should be compensated for any project enhanced value which may have accrued *after* the announcement of the first plan and *before* the adoption of the second plan. (*Ibid.,* pp. 492-495.)

In the case under review, there is not a scintilla of evidence that two projects were proposed for the Ontario Airport involving the taking of different areas of land or any changes or modifications in the Ontario master plan as approved by the F.A.A., thereby invoking the aforesaid exception to the general rule. Both sides apparently concede only one plan was approved and publicized. Rather, Ontario maintains that Kelber's appraisals improperly reflected project enhanced values in violation of the general rule. The city's argument may be formalized as follows: Prior to the proposed plans for expansion, 150 acres of publicly-owned land within the airport boundaries were available for lease; this acreage had access to airport taxiways; therefore, the 150 acres were in competition with Kelber's property; these competing parcels were no longer available for lease on May 4, 1970, because the proposed public improvement involved new restrictions on the use of these parcels; the elimination of this competing acreage, due to the proposed plan of expansion under which Kelber's property is being taken, has caused his property to have a higher value than it would have had prior to the proposal. (See *United States* v. *Michoud Industrial Facilities,* 322 F.2d 698, 702-705.)

The record is silent on the subject of whether the publicly-owned 150 acres were truly competing with, or comparable to, Kelber's property. Patently, there would necessarily be some restrictions on *airport-owned* property located *within* the boundaries of the airport which would not apply to *privately-owned* property adjacent to, but *outside* the boundaries of, the airport. However, assuming that the city is correct in its contention that at least some amount of project enhancement value accrued to Kelber's land under the master plan of the proposed improvement subsequent to the time when it was reasonably likely that his property would be taken for that improvement, we fail to see what bearing the master plan itself would have on this issue. The city was given ample opportunity to cross-examine Kelber's experts on the subject of whether their opinions included an amount due to project enhancement value. Kelber's expert (Metcalfe) indicated on cross-examination that if the publicly-owned parcels of property within the airport boundaries were still available for lease in competition with defendant's property, his opinion of the value of the subject property might be reduced by 5-10 percent. ■ It is elementary law in condemnation actions that where it appears that an expert's testimony of market value is based on improper considerations, it may be

stricken from the record. (*People* ex rel. *Dept. Pub. Wks.* v. *Dunn,* 46 Cal. 2d 639, 641 [297 P.2d 964].) ■ Manifestly, Ontario could have moved to strike the testimony of either of Kelber's experts in the event their opinion of fair market value included an amount attributable to project enhancement. Moreover, the jury was instructed that it should not value Kelber's property with reference to any enhancement arising from the planned improvements to the airport. Thus, the city's counsel could have argued that Kelber's valuations were improperly based on project enhancement and that the jury was obliged to discount said valuations accordingly.

In further support of its argument that the court erred in rejecting the Ontario master plan from admission in evidence, the city next contends that the jury could not appreciate the extent to which Kelber's valuations were improperly based on project enhancement unless they saw the map itself. However, a comparison of the *before* map (which was admitted in evidence) and the *after* map (which was rejected) indicates that the admitted map was much more suitable and adaptable to illustrate the elimination of the 150 acres than the master plan. The *before* map shows the present airport facilities and the public acreage within the boundaries of the airport which were available for leasing prior to the airport expansion proposal. It also shows the future airport boundaries, the land area to be taken to expand the airport as proposed, as well as the location of Kelber's property, including the 20 acres taken. To the limited extent that a map can show the competitive effects of the publicly-owned parcels within the airport boundary, the *before* map was sufficient. It would also suffice for the purpose of showing the effect of eliminating those parcels from competition with the subject property. On the other hand, the *after* map displays only the completed airport facilities and the final airport boundaries in relationship to Kelber's remaining property. Obviously, it does not show the part taken nor the 150 acres of land within the airport boundaries which were available for leasing. Consequently, the admission of the *after* map would not have aided Ontario in discrediting Kelber's appraisers on the subject of project enhancement. The only significant difference between the two diagrams is that the refused master plan shows the improved and expanded runways, taxiways, and terminal facilities to be constructed in the future. Stated simply, the master plan for development of the Ontario Airport had no relevancy whatsoever for the purpose of demonstrating that Kelber's experts had given a higher value to the 20 acres in contemplation of the improvement or the elimination of competing property.

One further fact should be noted on the subject of the admission of the *after* map or master plan. Since the refused project plan depicts the proximity of Kelber's remaining 46 acres to the improved airport facilities, its

admission could have been prejudicial to Kelber in that the jury could well have concluded his remaining 46 acres would substantially benefit from the construction of the public improvement, and as a consequence, returned with a verdict in a sum less than the fair market value of the 20 acres being condemned. This type of consideration by the jury would have been, in effect, a reduction for special benefits from the fair market value of the land being taken, a clear violation of statute. (See Code Civ. Proc., § 1248, subd. 3.) In view of the potential prejudice to Kelber, and considering that the admitted map sufficed for the purpose which Ontario purports to have had in mind when it sought to introduce the project map, the latter was properly excluded from evidence. (See Evid. Code, § 352.)

By reason of the foregoing analysis, the conclusion is inescapable that the proposed plan of development had no relevancy whatsoever to the issue of the fair market value of the land taken and, therefore, the trial court acted with propriety in rejecting the Ontario Airport master plan from admission under section 813 of the Evidence Code.[1] It likewise follows that had the plan of the proposed development been admitted herein, the landowner could have sustained serious prejudice in the event of an unfavorable verdict because the jury could have been unduly influenced by the special benefits flowing to the remaining 46 acres by reason of the proposed improvement.

Finally, assuming, *arguendo,* that the court's rejection of the master plan constituted error, the same could not be deemed prejudicial under any possible circumstances. As previously noted, the jury was informed of the nature and extent of all the major improvements. The *before* map was received in evidence. The condemnor's attorneys were allowed to cross-examine the owner's appraisers *in extenso,* not only as to the reasons for their opinions, but whether they had considered the elimination of the aforesaid 150 acres in their valuations of the subject property. The appraisers on both sides testified that their opinions of value were influenced solely by the factors existent on the date of valuation (May 4, 1970) and *not* in contemplation of the proposed improvements. The court correctly instructed the jury that it was to value the property taken solely on the basis of fair market value (BAJI No. 11.73), not what it was worth to Kelber for speculation and not what it was worth to the city for airport purposes (BAJI No. 11.75). Most importantly, the jury was explicitly and properly

---

[1]Nothing herein contained shall be deemed to prohibit the introduction in evidence of the plan of the proposed development in a condemnation proceeding where its relevancy is established in cases involving an entire "take," or in cases involving a partial "take" wherein severance damages and special benefits are in issue. Similarly, the plan would be admissible in cases where "public use" is in issue.

advised that it was *not* to value the 20 acres with reference to enhancement in value arising from the construction of the proposed airport improvements (BAJI No. 11.77). By returning with a sizable verdict, the jury must be deemed to have concluded that the 20 acres was a rare and valuable parcel of land, not because of the proposed expansion of the airport, but rather due to its size, its proximity to the airport, and in particular, because of the access rights it enjoyed therein.

■ The city's second contention on appeal is that the trial court committed prejudicial error in admitting evidence as to leases of property at four other airports. The argument is advanced on the premise that the other leases were of noncomparable property.

Section 816 of the Evidence Code on the subject of comparability provides as follows: "When relevant to the determination of the value of property, a witness may take into account as a basis for his opinion the price and other terms and circumstances of *any sale* or contract to sell and purchase *comparable* property if the sale or contract was freely made in good faith within a reasonable time before or after the date of valuation. In order to be considered comparable, the sale or contract must have been made sufficiently near in time to the date of valuation, and the property sold must be located sufficiently near the property being valued, and must be sufficiently alike in respect to character, size, situation, usability, and improvements, to make it clear that the property sold and the property being valued are comparable in value and that the price realized for the property sold may fairly be considered as *shedding light* on the value of the property being valued." (Italics added.)

Section 818 of the Evidence Code provides as follows: "For the purpose of determining the capitalized value of the reasonable net rental value attributable to the property . . . being valued . . . or determining the value of a leasehold interest, a witness may take into account as a basis for his opinion the rent reserved and other terms and circumstances of *any lease* of *comparable* property if the lease was freely made in good faith within a reasonable time before or after the date of valuation." (Italics added.)

■ The safeguards defining criteria for *comparability* in section 816 of the Evidence Code are incorporated in section 818 of the Evidence Code by the use of the term *comparable;* thus, for a lease property to be considered comparable for purposes of forming an opinion of the fair rental value of a subject property, it must meet the criteria specifically set forth in section 816 of the Evidence Code. (*City of Rosemead* v. *Anderson,* 270 Cal.App.2d 260, 266 [75 Cal.Rptr. 575].)

In applying sections 816 and 818 of the Evidence Code, the trial court must, in the first instance, make its own determination as to comparability of an offered sale or lease; it must determine from the foundational testimony offered, whether the statutory criteria are satisfied; this must be an independent determination by the trial court and not merely an acquiescence in the conclusions of the witness as to comparability and, accordingly, the reasons given by the experts are persuasive only to the extent that they are based on sound premises. (*Los Angeles etc. School Dist.* v. *Swensen,* 226 Cal.App.2d 574, 583 [38 Cal.Rptr. 214]; *Community Redevelopment Agency* v. *Henderson,* 251 Cal.App.2d 336, 342 [59 Cal.Rptr. 311].) But, manifestly, the trial judge, in applying so vague a standard (criteria for comparability), must be granted a wide discretion. (*County of Los Angeles* v. *Faus,* 48 Cal.2d 672, 678 [312 P.2d 680].) If the properties are sufficiently similar to have "some bearing" on the value under consideration, or to "shed light" on the proper value, the trial judge's discretion will not be interfered with on appeal. (*Merced Irrigation Dist.* v. *Woolstenhulme, supra,* 4 Cal.3d 478, 500.) Only where it is clear that the court has abused this discretion by not adequately heeding the safeguards for determining comparability will the appellate court reverse. (*People* ex rel. *State Park Com.* v. *Johnson,* 203 Cal.App.2d 712, 719 [22 Cal.Rptr. 149].)

Ontario maintains the court herein abused its discretion by admitting evidence as to the terms of leased property at the Hollywood-Burbank, the Van Nuys, and the Santa Monica Airports, as well as San Diego's Lindbergh Field. In advancing the argument, Ontario concedes the court did exclude evidence of lease transactions at the Los Angeles International Airport. Ontario first urges that the leases considered from the other airports were not comparable in that most of the leases were for much smaller acreages than the subject parcel. Leases from the Hollywood-Burbank Airport were approximately 1.4, 2.5, and 2.6 acres in size. Ten of the thirteen leases from the Van Nuys Airport ranged from 1.2 to 10 acres in size. The two leases at the Santa Monica Airport were 5.5 acres and 3 acres in size. The only lease from San Diego's Lindbergh Field was approximately 5 acres in size. The condemnor contends that these smaller acreages were noncomparable as a matter of law because the subject parcel comprised some 20 acres. (See *Community Redevelopment Agency* v. *Henderson, supra,* 251 Cal.App.2d 336, 341-342.)

Since the evidence received as to leases at the other airports was stated in terms of lease price per-acre per-year, their smaller sizes alone should not have caused any difficulty in determining the value per acre of Kelber's property. In *Henderson, supra,* evidence as to the leased value of a parcel

which was five times larger than defendant's parcel was held inadmissible on the ground of *size* alone; however, there is an obvious danger in admitting evidence as to the rental value of larger parcels; their greater size may make them more flexible and valuable, even in terms of price per-unit of surface area, than the condemned land. However, where leases admitted into evidence are for smaller parcels of land than that owned by the defendant, it is the defendant's parcel which, due to its size, might be more valuable per-unit of surface area. Consequently, it has been held that transactions in property of smaller sizes are not *per se* noncomparable. (*People* ex rel. *Dept. Pub. Wks.* v. *Silveira*, 236 Cal.App.2d 604, 622-624 [46 Cal.Rptr. 260].)

It should likewise be noted that Ontario was permitted to introduce into evidence leases for parcels of land at the Ontario International Airport which ranged in size from 1 to 12 acres. In explaining how these leases were comparable to the subject property, the condemnor states, "Admittedly, the size of the leased parcels were not as similar to the subject property as might be academically desired. However, the criteria of comparability are not absolutes." Ontario further concedes that, in the absence of evidence as to larger leases, the smaller leases are "better than nothing at all." We agree.

The city also attacks the admission of leases from other airports on the ground that those airport locations are as far away as 50-75 miles from the subject property and, therefore, are not comparable. It is apparent from both the record and Ontario's opening brief that the leases in dispute concerned properties which were adjacent to major airports and had clearly defined easements of access to the aircraft taxiways at those airports. Since there is no evidence that property bordering on the Ontario Airport and commercially leased for airport-related purposes (except Kelber's) had been granted easements of access, we infer that the evidence of leases from other airports was admitted at trial because there was no comparable property at the Ontario Airport. In the absence of closer comparable property, the trial court did not abuse its discretion in admitting into evidence transactions in properties which were located 25-75 miles distant from the subject property inasmuch as the distant properties were comparable in their most important characteristics to Kelber's. (See *County of San Luis Obispo* v. *Bailey,* 4 Cal.3d 518, 526 [93 Cal.Rptr. 859, 483 P.2d 27].) In *Bailey,* sales of property located 30-50 miles from the condemned land were held admissible because of the absence of closer property of similar size, character, suitability for use, and access.

The city also contends that the leases from other airports were inadmissible because the airports were of different sizes and character than

Ontario. It claims that the Santa Monica Airport, Van Nuys Airport, and Hollywood-Burbank Airport are general aviation airports, and that the San Diego Lindbergh Field is an air-carrier airport, whereas the Ontario Airport is a mixture of general aviation and air-carrier. The city does not explain how this would make leases at the first four airports more valuable than a lease at the Ontario Airport, which has a more balanced mixture of air activity than the other four facilities. The trial court apparently concluded that the Van Nuys, Santa Monica, and Hollywood-Burbank Airports and San Diego's Lindbergh Field were comparable to the Ontario Airport because they were the nearest major airports having leased property which benefited from an easement of access to the airport taxiways. The fact that Kelber's property is *privately* owned, and substantially free of restrictions, while the leases at the other airports involved properties owned by the *airports* themselves, would indicate that the Kelber property was even more valuable than some of the leases admitted into evidence. We conclude that evidence of leased properties at other airports was properly admitted in that the characteristics of the properties were sufficiently similar to Kelber's property to *shed light* on the value of the part taken.

■ In its final assault on the judgment, Ontario contends the trial court improperly limited or restricted the cross-examination of one of the defendant's expert witnesses (Cox) as to the basis for an appraisal made by said witness. Although the court prevented the condemnor's counsel from continuing to question the witness concerning the comparison between the resale of part of a parcel as against the prior sale of the whole parcel, commenting that counsel had asked the same question at least six different ways and the witness had already answered the question, it merely requested that counsel proceed with cross-examination on another point. Counsel was not precluded from further cross-examination of the witness, but only from repetitious questioning on one particular point.

The judgment is affirmed.

Gardner, P. J., and Tamura, J., concurred.