[No. D003711. Fourth Dist., Div. One. Apr. 2, 1987.]

COACHELLA VALLEY WATER DISTRICT, Plaintiff and Respondent, v.
WESTERN ALLIED PROPERTIES, INC., Defendant and Appellant.

970

## COUNSEL

Louis E. Goebel, Cheryl Shensa and Goebel, Shensa & Beale for Defendant and Appellant.

Justin M. McCarthy, Redwine & Sherrill and Gideon Kanner for Plaintiff and Respondent.

## OPINION

**WIENER, Acting P. J.**—The California Constitution guarantees the property owner in a condemnation action a jury trial on the question of "just compensation." (Cal. Const., art. I, § 19.) In this appeal we decide the court's evidentiary rulings improperly intruded on the jury's role. We therefore reverse the judgment and remand the case for retrial of the jury phase consistent with the views expressed in this opinion. At the same time we affirm the court's finding that Coachella Valley Water District complied with the requirements of the California Environmental Quality Act (CEQA). (Pub. Resources Code, § 21000 et seq.)

### FACTUAL AND PROCEDURAL BACKGROUND

The Coachella Valley Water District (Water District) commenced this eminent domain action against Western Allied Properties, Inc. (Western Allied) and others[1] to acquire land for construction of a flood control channel in the Palm Desert region of Riverside County. The events underlying the action began with a pair of natural disasters. In September 1979 tropical storm Kathleen caused severe flooding in the desert communities of Palm Desert, Rancho Mirage and Indian Wells. Tropical storm Doreen hit three years later. The damage from the two storms was estimated to be $60 million. The floods which resulted from Kathleen and Doreen were of a frequency

---

[1]Western Allied is the owner of the largest of several parcels totalling approximately 680 acres of undeveloped property. No other defendant named in the action actively participated in the trial.

to be expected once every 75 to 350 years. Neither storm was what the civil engineers describe as a "standard project storm."[2]

Western Allied's property lies at the apex of an alluvial fan (the cove area) created by waters flowing north out of Dead Indian and Carrizo Canyons into the Coachella Valley. Palm Desert is located on the broad lower reaches of the cove area.

Historically, most of the flood waters flowing out of Dead Indian and Carrizo Creeks made their way under Highway 74 and down the east side of the cove area. Under normal conditions the Western Allied property experienced only surface run-off originating on the property itself and in the higher elevations to the west and south. However, during tropical storm Kathleen some of the flood water from Dead Indian Canyon flowed across the Western Allied property.

Four days after tropical storm Kathleen, the Water District hired the Bechtel Corporation to develop an integrated flood control plan for the region. Bechtel submitted its report in August 1977 and outlined 15 alternative flood control systems. Bechtel recommended a plan which followed the existing flows along the east side of the cove area. After reviewing the alternatives and obtaining public input, on March 13, 1979, the Water District approved a plan which called for diversion of the flow to the *west* side of Highway 74, across the Western Allied property and into an upgraded Palm Valley Stormwater Channel.

At the same time the Water District was reviewing proposed flood control plans, Western Allied was attempting to develop the property as a residential and recreational complex. It first petitioned for annexation to Palm Desert in August 1978. The petition was withdrawn when the city council indicated development would be conditioned upon Western Allied providing certain on-site and off-site improvements for drainage and flood control. In May 1980 Western Allied applied to Riverside County for specific plan approval and zone changes for 1,300 residential units. While the Riverside County application was pending, Western Allied recorded a parcel map. The Water District conditioned building permit issuance on satisfaction of flood control requirements similar to those previously set by Palm Desert. In April 1981 the Riverside County Planning Department recommended denial of the application for plan approval due in part to unresolved flood control concerns. Western Allied withdrew its application. Palm Desert then invited

---

[2]A standard project storm is defined as ". . . the largest storm of record which has occurred in the area that you are designing or in a hydrologically similar basin, and it provides an actual storm rather than a hypothetical storm to use for the design."

Western Allied to present a second petition for annexation and tentatively indicated favorable action. The petition was pending on the date of valuation.

Because we consider specific rulings in detail in other sections of this opinion, we provide only a brief summary of the trial proceedings. On August 18, 1982, the Water District filed this condemnation action and obtained an order for immediate possession. The parties stipulated to trial in San Diego County following an appellate decision holding Western Allied was entitled to a change of venue to a neutral county.

The flood control channel across Western Allied's property was already completed on July 26, 1984, when trial began on the nonjury issues. After two and one-half months of trial the court filed a statement of decision and order granting several of the Water District's motions to exclude evidence in the jury phase of trial. This court denied Western Allied's petition for writ of mandate and/or prohibition to review the statement of decision and evidentiary rulings on the ground that there existed "an adequate remedy at law." (*Western Allied Properties, Inc.* v. *Superior Court,* 4 Civil D002517, order dated 12/20/84.)

The jury phase of the trial began on April 1, 1985. On May 24 1985, the jury returned a verdict finding: 1. The fair market value of the subject property was $237,500.

2. There were no severance damages.

3. The special benefits accruing to the subject property in the after condition amounted to $700,000.

4. The fair market value of the easement was $1,400.

By separate order the court set interest from the date of possession to the date of compensation at a market rate of 10.17 percent. Thereafter, judgment was entered and Western Allied appealed.

DISCUSSION

I

When we eliminate the mystique and accompanying confusion of the legalese associated with eminent domain proceedings, we can better appreciate the importance of the challenged evidentiary rulings. The crux of this

case is the value of Western Allied's property. Simply stated Western Allied wanted the Water District to buy high. To accomplish this goal and to convince the jury of the high market value of its property before condemnation, Western Allied wanted to show that development of the property was not conditioned on Western Allied providing at its own expense the flood control facilities proposed and later constructed by the Water District as part of the regional plan. Western Allied desired to present evidence there were other less expensive means of satisfying its obligation to address drainage and flood control concerns. From the Water District's perspective it wanted to show that Western Allied would have been unable to develop the property without constructing flood control facilities *identical* to those later built by the Water District. The Water District wanted to present evidence and later argue the value of the condemned property was enhanced by the project since the developers would not have to pay for the costly flood control channel. It is in this context that we review the legal principles pertaining to the jury's determination of property value.

■ As we stated at the outset, the property owner in an eminent domain action is entitled to a jury trial on the question of "just compensation." (Cal. Const., art. I., § 19.) All other issues of fact and law must be decided by the court. (*People* v. *Ricciardi* (1943) 23 Cal.2d 390, 402-403 [144 P.2d 799].)

The measure of compensation for the taking of property is the fair market value. (Code Civ. Proc., § 1263.310.) Section 1263.320 defines "fair market value" as: " . . . the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no particular or urgent necessity for so doing, nor obliged to sell, and a buyer, being ready, willing, and able to buy but under no particular necessity for so doing, each dealing with the other *with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available.*" (Code Civ. Proc., § 1263.320, subd. (a); italics supplied.)

Fair market value may not include any increase or decrease in value attributed to the project for which the property is taken. (Code Civ. Proc., § 1263.330.)

The Water District insisted from the start of the nonjury phase of trial that the court define the "before condition" of the property being condemned. It was convinced that these legal principles and *Keys* v. *Romley* (1966) 64 Cal.2d 396 [50 Cal.Rptr. 273, 412 P.2d 529] authorized the procedure it urged the court to follow. Western Allied adamantly objected to plaintiff's efforts on the ground the "before condition" of the property was not properly before the court in the nonjury phase of trial. The court's statement

of decision and evidentiary rulings were the product of this debate. The court defined the "before condition" as follows: "This court concludes that the before condition of the property requires provisions for control of flood waters as a condition of its development. The before condition of the subject property give it no rights to improve without consideration of the entire Cove area and the need for protection of the Cove area from events of the magnitude of a standard project storm. It is unreasonable to develop or to expect to develop the subject property without proper flood control facilities in the before condition or to conclude that the Palm Valley Channel which exists would not be used in connection with the solution of regional flooding problems."

The court expanded on its view of the "before condition" in the evidentiary rulings. "It is the court's determination that *the subject property is required as part of its before condition to accept, care for, and dispose of all entering flows including the flows of Dead Indian and Carrizo Creeks, up to, but not exceeding, such flows as generated by a standard project storm, along the westerly side of the cove area,* utilizing as far as practicable the Palm Valley Channel in its condition before the inception of the project for which the property is sought. . . .

"*The conditions existing on the date of value without regard to the project* for which the property herein is sought which caused the flows of Dead Indian and Carrizo Canyon Creeks to be directed along the easterly side of the cove and toward the Indian Wells-Deep Canyon area *are conditions which the court concludes politically, topographically and geographically were going to be changed.* . . .

"The storms Kathleen and Doreen and the damage done mandate a change in the flow patterns of the area at the apex of the cove within which the subject property is located, so that as of the date of valuation herein, the subject property would not be permitted to develop without provisions for the handling of a standard project storm in a fashion to locate the waters entering at the apex of that cove near the subject property along the westerly side of the cove."

The court then granted the Water District's motion to exclude "any testimony directly or indirectly asserting that in the before condition, the subject property could be developed contrary to these express conditions."

The Water District pressed too hard. ▇ ▇▇▇ We are cited to no case or statute which authorizes a court to take away from the jury the determination of the "before condition" of property where, as here, that determi-

nation is the key question to be decided and there is conflicting evidence on whether the "before condition" is tied to the Water District's specific project or some lesser improvement adequate for development of the subject property.[3]

Condemnation actions are frequently difficult for juries. The trials are sometimes inordinately long and the testimony extremely technical, even boring. Consequently conscientious trial judges such as the concerned judge in this case will make reasonable efforts to expedite the proceeding. ██ Unfortunately, here the court's ruling prevented the jury from fulfilling its constitutionally mandated responsibility to determine "just compensation" since it denied the jury access to all evidence relevant to the fair market value of the property.

In its evidentiary ruling the court acknowledged that conditions existing "on the date of value without regard to the project" caused water flows to be directed along the eastern side of the cove area. The court nonetheless concluded that these conditions "were going to be changed" under the Water District's regional plan. The court concluded any potential buyer would know development of the property was contingent on conditions equivalent to the Water District's flood control plan in its final form. The court excluded all evidence on flood control contrary to the Water District's plan to direct flows down the west side of the cove area. As a result of this determination Western Allied's expert witnesses were limited in giving their respective opinions of valuation. They could not rest their opinions on development which envisioned construction of less extensive flood control facilities.

The jury should have been permitted to hear all evidence relevant to determination of fair market value on the date of valuation. Western Allied should

---

[3]Of course courts routinely conduct hearings *in limine* to determine the scope of admissible evidence. (See, e.g., *People* ex rel. *Dept. Pub. Wks.* v. *Peninsula Enterprises, Inc.* (1979) 91 Cal.App.3d 332, 340 [153 Cal.Rptr. 895].) A court may exclude evidence not relevant to the valuation questions presented to the jury. In *City of Ontario* v. *Kelber* (1972) 24 Cal.App.3d 959 [101 Cal.Rptr. 428] the trial court properly excluded as irrelevant a diagram which depicted the "after condition" of airport expansion where no severance damages were claimed. More interesting is the approach outlined by the California Supreme Court in *Merced Irrigation Dist.* v. *Woolstenhulme* (1971) 4 Cal.3d 478 [93 Cal.Rptr. 833, 483 P.2d 1]. In a case where the subject property was not initially included within the scope of the project, the court created an exception to the general rule that fair market value may not include any increase or decrease attributable to the project for which the property is condemned. The court held that "increases in value, attributable to a project but reflecting a reasonable expectation that property will not be taken for the improvement, should properly be considered in determining 'just compensation.' " (*Id.* at p. 495.) In this limited circumstance the court should hear evidence and render a finding on the "date of 'probable inclusion' " in the project prior to empaneling the jury. (*Id.* at p. 498, fn. 12; see, e.g., *City of Los Angeles* v. *Waller* (1979) 90 Cal.App.3d 766, 770, 773 [154 Cal.Rptr. 12].)

have been allowed to present evidence of historical conditions which caused flows from Dead Indian and Carrizo Creeks to be directed along the eastern side of the cove area. In response to this evidence the Water District could have offered evidence on the factors which compelled construction of the project on the west side of the cove. Based on all the evidence the jury would then have been able to determine what a willing buyer and seller knew about restrictions on the development of the property in the "before condition." Because the jury's reasonable determination of this essential fact might differ from the court's determination, the court improperly intruded upon the jury's domain. Although the jury would have faced a more difficult task had it been required to define the "before condition," that responsibility is nonetheless the jury's since the definition of the "before condition" of the property is a first step in the determination of the fair market value of the property taken. Accordingly, we reverse for retrial consistent with these principles.

Implicit in the foregoing is our rejection of the court's statement that *Keys* v. *Romley, supra,* 64 Cal.2d 396 requires the conclusion that the "development of [the] subject property would not be independent of an overall flood control system for the entire area" which diverted flows from Dead Indian and Carrizo Creeks along the westerly side of the cove area. *Keys* holds that every person must exercise reasonable care in the use of his property to avoid injury to adjacent property through the flow of surface waters. "If the actions of both the upper and lower landowners are reasonable, necessary, and generally in accord with the foregoing, then the injury must necessarily be borne by the upper landowner who changes a natural system of drainage, . . ." (*Id.* at p. 409.) *Keys* v. *Romley* does not address the situation where floodwaters are diverted onto the upper landowner's property by a public entity as part of a regional flood control system. The facts at the time of the taking were in conflict and the court could not decide as a matter of law that Western Allied's responsibility to lower landowners necessarily required it to provide protection in the form of a flood control channel as it was actually constructed. *Keys* v. *Romley* is still relevant to this case, however. Although that case does not support the trial court's evidentiary rulings, on remand the jury should be instructed to consider the principles of *Keys* v. *Romley* in determining Western Allied's responsibility to provide for drainage of surface waters necessarily disturbed by the landowner's development of the property.

## II

For the guidance of the court on retrial we consider two additional issues which relate to valuation.

## A.

The 30 acres condemned by the Water District for construction of a flood control channel bisect Western Allied's 680-acre parcel. Because the resolution of necessity does not expressly provide for access across the channel, Western Allied argued the Water District's action left the larger 530-acre parcel landlocked and unavailable for development. The property owner sought hefty severance damages to compensate for the alleged loss of use of the property.

The court rejected two attempts by the Water District to reduce the impact of severance and concluded in its statement of decision: "Plaintiff's proffered stipulation to permit access in the after condition across the channel, which was not accepted by the defendant, does not create a mandatory duty on the plaintiff or any of its successors in favor of the defendant or any of its successors with respect to access to the severed property. The plaintiff's policy of granting both public and private encroachments in its rights of way by way of encroachment permits, so long as plaintiff maintains discretion in the issuance of such permits, is not sufficient to constitute a right in favor of the defendant with respect to access to such property. . . ."

Approving the court's first two rulings regarding evidence on severance damages, Western Allied nonetheless complains the court erred in a third ruling which permitted the jury to determine whether there was a reasonable probability the property owner would be granted access across the channel at some time in the future. Western Allied cites *County of San Diego* v. *Bressi* (1986) 184 Cal.App.3d 112 [229 Cal.Rptr. 44], a case decided after the evidentiary rulings in this case, and argues evidence of the reasonable probability the Water District will grant access improperly limits the scope of the taking as defined in the resolution of necessity.

*Bressi* involved the taking of a avigation easement and the "scope of the taking" defined in the resolution of necessity included use by " 'every type of aircraft which is now in existence or which may be developed in the future for both commercial and noncommercial flights; . . .' " (*County of San Diego* v. *Bressi, supra,* 184 Cal.App.3d at p. 116.) ▮ The court ruled that a jury is entitled to consider all evidence relevant to valuation as long as such evidence does not contradict the scope of the taking as defined by the resolution of necessity.

Here, as in *Bressi,* the issue raised by Western Allied is easily eliminated by formal amendment to the resolution of necessity before retrial of the valuation phase. Apart from the evidentiary impact already considered by the

trial court, we question the propriety of the stipulation regarding access which was proposed by the Water District and rejected by Western Allied. Had the parties agreed to the stipulation, it would have acquired the force of a judicial order. Once incorporated into the final judgment, the order would have been binding on the Water District—effectively modifying the resolution of necessity without further discussion or hearings by the condemning authority. However, our concern regarding the fairness of such a procedure is outside the scope of the issues presented in this appeal.

Absent action by the Water District to amend the complaint, on remand the court should follow the principles set forth in *Bressi* in determining the evidence to be presented to the jury.

### B.

■ After judgment was entered on the jury's valuation of the property condemned, the court next heard testimony and solicited briefing on the prevailing market rate of interest necessary to compensate Western Allied for the value of the property's use between the date of possession and date of payment by the Water District. The Water District's expert testified on rates of return between August 1982 and August 1985 on United States treasury bills and notes, certificates of deposit issued by commercial banks, and commercial paper. Western Allied presented no testimony on the issue, either orally or by affidavit.

Applying the prudent investor standards set forth in *Redevelopment Agency* v. *Gilmore* (1985) 38 Cal.3d 790 [214 Cal.Rptr. 904, 700 P.2d 794], the court set interest at 10.17 percent, expressly finding that the six-month certificate of deposit offered the highest rate of return commensurate with safety of principal. Western Allied argues the court erred in its calculation of interest because a "prudent investor" would have rejected a six-month certificate of deposit and "locked his principal into the longest and safest obligation he could find" once interest rates started falling.

*Gilmore* provides guidelines to assist the trial court in applying the "prudent investor" standard. "In general, the trial court should examine, at the condemnee's behest, the rates prevailing during the period a condemnation payment was delayed for all forms of money-market obligations, governmental and private, which prudent depositors and investors normally purchase for income purposes, and whose terms or maturities fall within the period of delay." (*Redevelopment Agency* v. *Gilmore, supra,* 38 Cal.3d at p. 806.)

The factfinder's decision on the market rate of interest is upheld if supported by substantial evidence, unless based on incorrect legal principles. (*Id.* at p. 807.) We conclude the court followed the proper guidelines in determining the market rate of interest in this case.

### III

Having carefully reviewed the record, we also conclude there was substantial evidence to support the court's finding that the Water District complied with the California Environmental Quality Act (CEQA), Public Resources Code, section 21000 et seq., in the planning and implementation of the project.

### DISPOSITION

Judgment affirmed in part, reversed in part and case remanded for retrial of the jury phase in accordance with the principles expressed in this opinion. Costs to defendant Western Allied Properties, Inc.

Work, J., and Butler, J., concurred.

Respondent's petition for review by the Supreme Court was denied July 15, 1987.