Filed 4/21/15 Modified and certified for publication 5/20/15 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| SACRAMENTO AREA FLOOD CONTROL AGENCY, | C073098 |
| Plaintiff and Respondent, | (Super. Ct. No. 34-2010-0070156) |
| v. | |
| BRINDERJIT S. DHALIWAL, as Co-executor, etc., et al., | |
| Defendants and Appellants. | |

In this eminent domain proceeding, plaintiff Sacramento Area Flood Control Agency (SAFCA) acquired a fee simple interest in, a roadway easement over, and a temporary construction easement over a portion of defendant Ranjit S. Dhaliwal's roughly 131-acre property in the Natomas Basin for use in connection with the Natomas Levee Improvement Program. The jury awarded Dhaliwal $178,703 for the property taken and $29,100 in severance damages. Brinderjit S. Dhaliwal and Gurdeep S. Dhaliwal, as co-executors of Dhaliwal's estate, appeal.[1]

---

[1] The notice of appeal was filed on behalf of Ranjit S. Dhaliwal. On August 29, 2013, this court ordered that Brinderjit S. Dhaliwal and Gurdeep S. Dhaliwal, as co-executors of the Estate of Ranjit S. Dhaliwal, be substituted as appellants in place of Ranjit S. Dhaliwal, deceased, in this matter. Ranjit, Brinderjit, and Gurdeep Dhaliwal are referred to herein as "Dhaliwal" for ease of reference.

1

Dhaliwal does not contest SAFCA's right to take the property. Rather, his challenge is limited to the compensation award. His principal contention on appeal is that the trial court prejudicially erred in allowing SAFCA to introduce evidence concerning "future access" to the property. He claims that such evidence is speculative because "[a]fter this case is concluded, the County and SAFCA would be able to deny Dhaliwal access to the property," leaving him landlocked. We shall conclude that the trial court did not err in admitting the challenged evidence because such evidence had the potential to affect the property's market value, and was not conjectural, speculative, or remote (*Metropolitan Water Dist. of So. California v. Campus Crusade for Christ, Inc.* (2007) 41 Cal.4th 954, 972-973 (*Campus Crusade*)) and did not contradict the scope of the taking as defined by the resolution of necessity (*County of San Diego v. Bressi* (1986) 184 Cal.App.3d 112, 123 (*Bressi*); *Coachella Valley Water Dist. v. Western Allied Properties, Inc.* (1987) 190 Cal.App.3d 969, 978-979 (*Coachella*)).

Dhaliwal also contends that the trial court erred in allowing SAFCA's appraiser to critique his appraiser's valuation of the property, and that SAFCA's counsel committed misconduct during closing argument by commenting on Dhaliwal's absence and referring to SAFCA's inability to pay more than fair market value for the property. We shall conclude that neither contention has merit, and thus, affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A. *The Natomas Levee Improvement Program*

The Natomas Basin is a large flood plain bordered by the American and Sacramento Rivers and includes portions of the City of Sacramento and the Sacramento International Airport. Because the existing levees are not adequate to protect the basin from a severe flood, SAFCA is repairing approximately 35 of the existing 42 miles of levees to provide the basin with at least a 100-year level of flood protection. This project is known as the Natomas Levee Improvement Program.

2

At all relevant times herein, there has been a de facto building moratorium in the basin. The first floor of any new building in the basin must be built above the base flood elevation, which generally speaking is not economically feasible. The de facto moratorium can be lifted once the project is complete and SAFCA is able to certify that the levee provides 100-year flood protection.

On December 10, 2009, SAFCA's board of directors adopted a resolution of necessity declaring that the public interest and necessity required the project. SAFCA also determined that it was necessary for it to acquire a fee simple interest in approximately 10.94 acres, a roadway easement over approximately 0.499 acres, and a temporary construction easement over approximately 8.796 acres, including all riparian and water rights appurtenant to the fee acquisition portion, for the "construction, operation, reconstruction, repair and maintenance of improvements for present and future flood control, infrastructure relocations, habitat mitigation and other purposes in connection with the Project."

B. *The Property Before SAFCA's Acquisition*

Prior to SAFCA's acquisition, the property consisted of two legal lots totaling just over 131-acres. It was (and is) zoned "AG-80," meaning it is approved for all agricultural uses and requires a minimum parcel size of 80 acres. It is located in the basin, on the land-side of the levee directly east of Garden Highway, north of Interstate 5, and west of the Sacramento International Airport. It was (and is) used for farming. There were three buildings on the property, a vacant single-family house, a small storage shed, and a barn. The house was 80 years old, had not been occupied since 2008, and was in fair to poor condition. The shed and barn were also in disrepair. There was a driveway leading to the house off Garden Highway.

In addition to Garden Highway, the property was accessible from North Bayou Road, a public road that runs along the south side of the property, and Schoolhouse Road, a private dirt road that runs along the east and southeast border of the property.

3

## C. SAFCA's Acquisition

SAFCA acquired three interests in the subject property: (1) a fee simple interest in an approximately 10.94-acre strip of land along Garden Highway, which included the house and other buildings; (2) an approximately 0.499-acre roadway easement along the southern border of the property; and (3) an approximately 8.796-acre temporary construction easement with a term of three years. Following SAFCA's acquisition, the property no longer is accessible via Garden Highway, but it continues to be accessible via North Bayou and Schoolhouse Roads.

## D. Dhaliwal's Appraisal

### 1. Fair Market Value

At trial, Dhaliwal presented the testimony of appraiser Arthur Gimmy to establish the fair market value of the property, along with severance damages and benefits, if any. Gimmy found that the highest and best use of the property prior to SAFCA's acquisition was as rural residential property-- a combination of agricultural and residential living. Using February 22, 2010, as the date of value, he determined that the fair market value for the subject property before SAFCA's acquisition was $2.3 million or $17,500 an acre. In making his determination, he used comparable sales, including two in the basin, namely: (1) a 275-plus acre property directly east of the subject property that sold in 2004 for $10,665 an acre; and (2) a 96.83 acre property along Garden Highway that sold in 2005 for $10,699 per acre. He then adjusted those figures for time and other factors. He opined that since 2004 and 2005 on the one hand, and 2010 (the date of valuation) on the other, prices for this type of property, which has the potential to be used as mitigation land for future development, increased 40 to 50 percent. In reaching this conclusion, Gimmy relied on "trends in prices," but not on any one specific sale. He explained that this type of property was exempt from the recent downturn in real estate prices due to its potential for use as mitigation land for future development in the basin.

4

After determining the value of the whole, Gimmy allocated the appraised value between what he deemed "the key components of the property"-- a 3-acre homestead and 128 acres of agricultural land. Using comparable sales of small parcels comprised of 5 acres or less, he valued the 3-acre homestead at $375,000 ($215,000 for the land and $160,000 for the improvements). During cross-examination, he acknowledged that smaller properties sell for much more per acre than larger properties and that the fictitious 3-acre homestead could not legally be bought and sold since the property, as zoned, could not be divided into parcels of less than 80 acres. He valued the remaining 128 acres of agricultural land at $15,000 an acre.

Gimmy used the same methodology to value the 10.94-acre strip of land acquired by SAFCA. He divided the area into a 3-acre homestead and 7.9 acres of agricultural land, valued the 3-acre homestead at $375,000 and the 7.9 acres of agricultural land at $90,000, for a total of $465,000.[2] He valued the permanent roadway easement at $3,600 and the temporary construction easement at $39,100. In sum, he determined that the fair market value for the property SAFCA acquired is $507,700, which he then rounded up to $510,000.

2. Severance Damages and Benefits

Gimmy opined that the highest and best use of the property following SAFCA's acquisition is "[f]or agricultural purposes only" because the property lost its access to Garden Highway and the most desirable location for a house, and "[t]he rest of the access to the property is . . . in a gray area." Comparing the sales of what he described as three "problem" properties, Gimmy determined that the remainder was worth $1.17 million, or $10,000 per acre, which represented a $620,000 reduction in value. He further concluded that there would be no benefit to the remainder from the project. Thus, in addition to the

---

[2] Gimmy discounted the value of 2.125 of the 7.9 acres 90 percent because it is encumbered by a roadway easement.

$510,000 for the property SAFCA acquired, Gimmy found that Dhaliwal was entitled to $620,000 in severance damages, for a total of $1.13 million in just compensation.

On cross-examination, Gimmy acknowledged that farmers did not use the Garden Highway access for heavy equipment, such as a combine, and that they primarily accessed the property along North Bayou and Schoolhouse Roads. He further acknowledged that the access point on the corner of North Bayou and Schoolhouse Roads "physically" exists following SAFCA's acquisition but stated that "legally we don't know what its status is." He explained that he had been told by Dhaliwal's counsel that Dhaliwal must apply for an encroachment permit to access North Bayou Road and that "there is no legal guarantee of access." He also indicated there was "no guarantee" Dhaliwal or his tenants would be able to use Schoolhouse Road once the project was completed. While he acknowledged that Dhaliwal did not have any legal right to use Schoolhouse Road prior to SAFCA's acquisition and that his use "was just custom," he asserted that the situation was different now because SAFCA owns an interest in the fee under Schoolhouse Road, along with several other private owners. When asked if Dhaliwal had any less legal right to use the road after SAFCA's acquisition, Gimmy responded, "It's -- not legally. But in terms of who you're dealing with, it's different. Before, you had local farmers that you knew and, by custom, you allowed each other to use each other's property. [¶] In the after condition, you have a county agency owning this farm road that was used, just customarily, by local farmers. It's a different situation." In other words, "it's a risk because now SAFCA owns the property instead of some private property owner."

E. *SAFCA's Appraisal*

1. Fair Market Value

At trial, SAFCA presented the testimony of appraiser Brent Blaesi to establish the fair market value of the property, along with severance damages and benefits, if any. Blaesi found that the highest and best use for the property prior to SAFCA's acquisition

6

was as agricultural property. Using February 22, 2010, as the date of value, Blaesi determined that the fair market value for the subject property prior to SAFCA's acquisition was $1,234,822, or $9,400 per acre. In making his determination, Blaesi compared the sales of six properties, including two in the basin --the same two used by Gimmy. Unlike Gimmy, Blaesi found that the value of potential mitigation land in the basin, like the subject property, had declined in value at an average rate of 0.8 percent per month between 2005 and 2012 due to declining demand. He explained that the real estate market "tanked" in 2005 and was followed by the de facto building moratorium in 2008. As a result, development in the basin came to a halt, and there was no demand for mitigation land.

Using the $9,400 per acre figure, Blaesi determined that the value of the 10.94-acre strip of land acquired by SAFCA was $99,841, and the value of the permanent road easement was $4,703. Blaesi concluded that the house contributed no value to the property because the buyer who would pay the highest price for the property would be an investor who would hold the property for its future use as mitigation land, while continuing to lease the property for row-crop farming, and thus, would have little use for a house on the property. Using agricultural rental figures on the property over the past few years, he found that the value of the temporary construction easement was $3,450. In sum, he determined the fair market value of the property acquired by SAFCA was $108,000.

2. Severance Damages and Benefits

Blaesi calculated severance damages as the cost of replacing the functions served by the lost Garden Highway access, namely access to a public road and to a portion of the property where the irrigation ditch is located. He determined that a new access driveway out to North Bayou Road and a new farm road along the west side of the property would cost $28,600.

7

Blaesi found that access to the remainder essentially remained the same both before and after SAFCA's acquisition. He explained that farmers preferred to access the property via North Bayou Road or Schoolhouse Road as opposed to Garden Highway. Moreover, there is an easement along the west side of the property that granted Reclamation District (RD) 1000 "the exclusive [and] perpetual rights to use th[e] easement for" flood control. According to Blaesi, that easement would have allowed RD 1000 to cut off Dhaliwal's Garden Highway access at anytime. Thus, that access was not guaranteed.

Blaesi found that there was no difference in the property's access via North Bayou Road following SAFCA's acquisition because North Bayou Road is a public road. He agreed that Dhaliwal would need to obtain an encroachment permit if he decided to install a driveway connecting the property to North Bayou Road but said the process for obtaining such a permit was "straightforward," explaining that such permits are granted on a regular basis and typically cost $300 to $500.

Blaesi likewise determined that there was no difference in the property's access via Schoolhouse Road following SAFCA's acquisition. He explained that Schoolhouse Road is a private road reservation that was created as part of the Natomas Elkhorn subdivision. In another eminent domain action, SAFCA acquired the east side of Schoolhouse Road, subject to others' rights to use the road. According to Blaesi, a knowledgeable buyer would not believe that SAFCA could cut off access to Schoolhouse Road because "all the property owners in that subdivision [have] the right to use that road. So SAFCA has no more right to cut it off than anybody else that uses that road does."[3] Blaesi noted that SAFCA had constructed a giant garter snake canal through the

---

[3] Blaesi's statement is consistent with applicable law. (See *Hocking v. Title Ins. & Trust Co.* (1951) 37 Cal.2d 644, 650 ["It is established law in [California] that the title to [a lot

8

area and went to considerable trouble to build it away from Schoolhouse Road so as not to interfere with anyone's use of the road. SAFCA also wrote a letter to Dhaliwal indicating that it had no intention of interfering with his right to use the road.

Finally, Blaesi found that the remainder would benefit from the project in that the completion of the project would result in the lifting of the de facto building moratorium, and thereby increase the value of the remainder by $266,833. Blaesi explained that under the draft joint vision plan that is expected to govern future development in the area, the county will require that all developers mitigate for the loss of undeveloped land by conserving one acre of land for each acre developed. Without the joint vision plan, properties like the subject property would only have value as agricultural land. Blaesi further explained that once the de facto moratorium is lifted and building in the basin resumes, there will be a demand for agricultural land, such as the subject property, for use as mitigation land. Because the project's benefit exceeded the amount of severance damages, Blaesi concluded Dhaliwal was not entitled to any severance damages. In sum, Blaesi determined Dhaliwal was entitled to just compensation in the amount of $108,000.

*F. The Jury's Verdict*

The jury awarded Dhaliwal $207,803 in just compensation, consisting of $170,000 for the 10-plus acres acquired by SAFCA, $4,703 for the roadway easement, $4,000 for the temporary construction easement, and $29,100 in severance damages. The jury found that there were no project benefits.

DISCUSSION

Before we address the issues raised on appeal, a brief overview of eminent domain law and procedure is in order. Article I, section 19 of the California Constitution requires

---

created by a subdivision map] embraces an easement to use all of the streets disclosed on a subdivision map.].)

9

that the owner whose property is taken for a public use be paid "just compensation, ascertained by a jury unless waived."

"The Legislature has defined the measure of just compensation as 'the fair market value of the property taken.' (Code Civ. Proc., § 1263.310.)[4] 'The fair market value of the property taken is the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no particular or urgent necessity for so doing, nor obliged to sell, and a buyer, being ready, willing, and able to buy but under no particular necessity for so doing, each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available.' (§ 1263.320, subd. (a).) 'As section 1263.320 indicates, the fair market value of property taken has not been limited to the value of the property as used at the time of the taking, but has long taken into account the "highest and most profitable use to which the property might be put in the reasonably near future, to the extent that the probability of such a prospective use affects the market value." ' [Citation.] This prospective use 'is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held.' [Citation.]

"When[, as here,] the property taken is part of a larger parcel, the owner is compensated not merely for the injury to the part taken but also for the injury, if any, to the remainder. (§ 1263.410, subd. (a).) Compensation for injury to the remainder is the amount of the damage to the remainder caused by the taking, reduced by the amount of the benefit to the remainder caused by the taking. (§ 1263.410, subd. (b).) Such compensation is commonly called 'severance damages.' [Citation.]

"The procedures governing eminent domain actions differ in some respects from those governing other actions. For example, 'all issues except the sole issue relating to

_____

4 Further undesignated statutory references are to the Code of Civil Procedure.

10

compensation . . . are to be tried by the court.' [Citation.] The defendant (i.e., the property owner) shall present evidence on the issue of compensation first and shall commence and conclude the argument. (§ 1260.210, subd. (a).) And, '[e]xcept as otherwise provided by statute, neither the plaintiff nor the defendant has the burden of proof on the issue of compensation.' (§ 1260.210, subd. (b).)" (*Campus Crusade, supra,* 41 Cal.4th at pp. 965-966, fn. omitted.) With these general principles in mind, we turn to the issues raised in this appeal.

## I
### The Trial Court Did Not Abuse Its Discretion in Admitting SAFCA's Evidence Concerning "Future Access"

Dhaliwal contends that the trial court abused its discretion in allowing SAFCA to introduce "speculative evidence of future access." He asserts that following SAFCA's acquisition, all access via Garden Highway is lost, and access via North Bayou and Schoolhouse Roads is speculative because "each of them requires future encroachment permits from either the County of Sacramento and/or SAFCA," which, if denied, would leave him landlocked. He argues that "[b]ecause the County and SAFCA can deny him access now that the trial is over, preventing him from installing this speculative replacement driveway, [he] has not received his constitutional right to just compensation." As we shall explain, at the time the trial court ruled on Dhaliwal's motion to exclude SAFCA's evidence of future access,[5] it had before it evidence that the property remained accessible via both North Bayou and Schoolhouse Roads and conflicting evidence as to whether such access could be cut off in the future. As we shall further explain, there is nothing in SAFCA's resolution of necessity that reasonably can be construed as preventing Dhaliwal from continuing to access his property via North

---

[5] In reviewing the trial court's ruling, we must consider the facts before the court *at the time of its ruling*, and not by reference to evidence produced at a later date. (*People v. Welch* (1999) 20 Cal.4th 701, 739.)

11

Bayou and Schoolhouse Roads following SAFCA's acquisition. Under these circumstances, we conclude that the trial court did not err in allowing SAFCA to introduce evidence of future access that had the potential to affect market value (*Campus Crusade, supra,* 41 Cal.4th at pp. 972-973) and was necessary to refute Dhaliwal's claim that such access was uncertain.

Prior to trial, Dhaliwal filed various motions in limine. In his motion in limine No. 2, he moved "[t]o exclude any evidence of possible access to the subject property via School House [*sic*] Road or North Bayou Road" on the grounds that such evidence contradicts the resolution of necessity and is speculative in that each of those "potential access points . . . requires future encroachment permits from either the County of Sacramento and [*sic*] plaintiff SAFCA." Citing to the deposition transcript of SAFCA's chief engineer John Bassett and the notes of SAFCA's appraiser Brent Blaesi, Dhaliwal made the following proffer: "In the 'before' condition . . . the SUBJECT PROPERTY enjoyed access over 1) the Garden Highway; 2) North Bayou Road; and 3) School House [*sic*] Road. [¶] As part of this eminent domain action and the Levee Project, the access to the Garden Highway has been completely eliminated." "As part of this Levee Project, plaintiff has condemned the access from School House [*sic*] Road in another eminent domain action entitled SAFCA v. Pacific Terrace, Sacramento County Superior Court No. 34-2009-00054924." SAFCA " 'purchased underlying fee with [the] understanding there was a private road easement . . . that would allow property owners [in the Natomas Elkhorn Subdivision] to use it.' " Because the subject property is not part of the subdivision, Dhaliwal " 'doesn't have the right to use the private road legally at this point. He would have to prove he has prescriptive rights.' " " 'SAFCA won't prohibit [Dhaliwal] from using . . . [Schoolhouse Road], but they will not grant [him a] formal right' " to do so. "As a part of [the] Levee Project, SAFCA is condemning all access of the SUBJECT PROPERTY along North Bayou Road. SAFCA will take ownership of Dr. Dhaliwal's land from Dr. Dhaliwal, and then will transfer the property to the County

12

of Sacramento." "[A]ccess to . . . [the property] would continue across that roadway easement," but Dhaliwal "would need to get an encroachment permit from Sacramento County" if he wants to have access through the roadway easement.

Dhaliwal argued that SAFCA's evidence concerning access to the property following its acquisition was speculative because the property "might be landlocked in the future." Dhaliwal explained, however, that his appraiser "did not appraise the property as if landlocked (which would have increased damages), but instead testified [at deposition] that the access cloud would decrease the value of the remaining property from $17,500 per acre to $10,000 per acre."

SAFCA opposed Dhaliwal's motion to exclude evidence of possible access via North Bayou and Schoolhouse Roads, arguing that "the jury is entitled to consider all evidence relevant to valuation so long as it doesn't contradict the RON [(resolution of necessity)]."[6] SAFCA asserted that Dhaliwal "failed to cite to a single contradiction between the RON and SAFCA's evidence of post-Project access to the remainder. . . . Therefore, SAFCA should be permitted to introduce evidence showing that Dhaliwal will be able to access the Remainder from both Schoolhouse and North Bayou Roads . . . . Whether or not that access is adequate and the amount Dhaliwal should be compensated for any perceived change in access is a question of fact for the jury." Citing to Bassett's deposition transcript and Blaesi's declaration, SAFCA made the following proffer: "In the before and after condition, Dhaliwal is and will be able to access the Property directly from Schoolhouse [Road]." "Schoolhouse [Road] is a private road that was created as part of the Natomas Elkhorn Subdivision. . . . In the before condition, Dhaliwal's tenant-farmers accessed the Property from multiple locations along Schoolhouse [Road] . . . .

---

[6] On our own motion, we augment the record on appeal to include SAFCA's opposition to Dhaliwal's motions in limine, filed October 29, 2012. (Cal. Rules of Court, rule 8.155(a)(1)(A).)

No part of SAFCA's acquisition affects Dhaliwal's access from Schoolhouse [Road] . . . ." There was "no need for SAFCA to reserve . . . rights for Dhaliwal [over Schoolhouse Road] because [its] acquisition does not affect the access that Dhaliwal has enjoyed previously from Schoolhouse [Road]." There was no need for Dhaliwal to obtain an encroachment permit from the County or SAFCA in order to continue to use Schoolhouse Road because such permits are issued by the County to allow construction activities in a *public* right away, and Schoolhouse Road is a private road. "SAFCA is acquiring a 0.5-acre roadway easement that parallels Dhaliwal's border with North Bayou" and "will grant the roadway easement to the County . . . to widen the public road. After SAFCA's acquisition, Dhaliwal will continue to have a lengthy frontage on N. Bayou Road and will be able to continue accessing the Remainder from N. Bayou as he has in the past." Blaesi "investigated the likelihood that Dhaliwal could obtain an encroachment permit from the County, if required, to connect his driveway to N. Bayou. Based on his experience in previous cases and his investigation in this case, he concluded that the likelihood of obtaining a permit was very high, if not guaranteed." SAFCA asserted that it "did not need to reserve any rights for Dhaliwal because he will have rights to use the public road, just like anyone else."

At the hearing on Dhaliwal's motion in limine No. 2, the trial court agreed with Dhaliwal that SAFCA could not "offer speculative testimony" but found there was "a dispute about what kind of access is presently or was available to that property from [North Bayou and Schoolhouse] roads. That's a factual determination." The court then asked: "You disagree about that, right? So isn't that something the jury is going to have to decide based upon whatever testimony comes up?" Both parties responded in the affirmative. Dhaliwal's counsel then asked the court, "Denied without prejudice to raise later if I deem it appropriate," and the court responded, "Denied without prejudice."

With limited exceptions discussed below, Dhaliwal failed to renew his objection at trial, and thus forfeited his challenge to SAFCA's evidence concerning future access to

14

the property on appeal.[7] (*People v. Mills* (2010) 48 Cal.4th 158, 170.) In any event, Dhaliwal's claim is without merit.

In determining the fair market value of a property, the jury is entitled to consider any factor having "the potential of affecting the market value" so long as the effect of the factor on market value is not conjectural, speculative, or remote (*Campus Crusade,* 41 Cal.4th at pp. 972-973), and does not contradict the scope of the taking as defined by the resolution of necessity (*Bressi, supra,* 184 Cal.App.3d at p. 123; *Coachella, supra,* 190 Cal.App.3d at pp. 978-979). "An owner of land that abuts a street (or road) has an easement in that street for the purposes of ingress and egress to and from his property and from the street to the next intersecting public roadway in either direction." (1 Matteoni & Veit, Condemnation Practice in Cal. (Cont.Ed.Bar 3d ed. 2009) § 5.20, p. 280; see also *Bacich v. Board of Control* (1943) 23 Cal.2d 343, 352.) "It is the owner's private right as distinguished from the owner's right as a member of the public to travel on the street. Compensation is due if the taking directly extinguishes the abutting owner's right of ingress and egress to the public street." (1 Matteoni & Veit, Condemnation Practice in Cal. (Cont.Ed.Bar 3d ed. 2009) § 5.22, p. 283; see also *People v. Al. G. Smith Co.* (1948)

---

[7] For example, at trial Bassett testified, *without objection*, that Dhaliwal's tenant farmers used an "access point . . . from North Bayou Road to drive onto Schoolhouse Road" in both the before and after conditions. The county has not required owners affected by the project to obtain encroachment permits where, as here, SAFCA constructed the road in question. Dhaliwal had no recorded rights in the eastern portion of Schoolhouse Road either before or after SAFCA's acquisition of a portion thereof. The project would have no "affect on the access of farmers using the subject property to Schoolhouse Road" because "the area that the farmers use in the dirt road is on . . . the Dhaliwal property." If SAFCA wanted to close off the portion of Schoolhouse Road that it had acquired, it would have to "condemn the rights of the people [who own property in the Natomas Elkhorn Subdivision] who use that road." An encroachment permit would be required if Dhaliwal decided to construct a driveway connecting his property to North Bayou Road; however, "a buyer of the property would [not] believe that an encroachment permit like that would be difficult to get" because with minimal effort the buyer would discover that such permits are granted on a regular basis and cost between $300 and $500.

86 Cal.App.2d 308, 311.) In addition, "[a] substantial, unreasonable interference with the property owner's easement of access to the general system of public roadways is a deprivation of a property right; when such interference results in connection with a partial taking in eminent domain, the condemnee must be compensated for the depreciation in the value of his or her remainder." (1 Matteoni & Veit, Condemnation Practice in Cal. (Cont.Ed.Bar 3d ed. 2009) § 5.20, p. 280; see also *Breidert v. Southern Pac. Co.* (1964) 61 Cal.2d 659, 663-667.)

As in any other judicial proceeding, the court determines the admissibility of evidence and the scope of admissible evidence. (*City of Ripon v. Sweetin* (2002) 100 Cal.App.4th 887, 900-901.) The trial court is vested with considerable discretion in admitting or rejecting evidence of value. (*City of San Diego v. Barratt American, Inc.* (2005) 128 Cal.App.4th 917, 936.)

Dhaliwal's claim that the evidence is speculative is premised on the assumption that SAFCA and/or the county may cut off access to the property in the future, leaving it landlocked. At the time the trial court denied Dhaliwal's motion to exclude evidence concerning future access, it had been presented with an offer of proof, supported by a declaration and deposition testimony, that contradicted that assumption. Among other things, SAFCA presented evidence that "Dhaliwal will continue to have a lengthy frontage on N. Bayou Road [(a public road)] and will be able to continue accessing the Remainder from N. Bayou as he has in the past." While Dhaliwal will have to obtain an encroachment permit should he decide to construct a driveway connecting his property to North Bayou Road, SAFCA's proffer included evidence that the likelihood of obtaining such a permit was "high, if not guaranteed," and in any event, the lack of a driveway would not preclude Dhaliwal or his tenants from accessing the property from other points along North Bayou Road. SAFCA's proffer also included evidence that all owners of property within the Natomas Elkhorn subdivision have a legal right to use Schoolhouse Road because it is shown as a road on the subdivision map creating the subdivision.

16

Thus, "as merely one owner of the land underlying half of Schoolhouse" Road, SAFCA "has no legal right to close it to traffic." SAFCA also cited to *Hocking v. Title Ins. & Trust Co., supra,* 37 Cal.2d at page 650, which provides: "It is established law in [California] that the title to [a lot created by a subdivision map] embraces an easement to use all of the streets disclosed on the subdivision map." In sum, at the time the trial court ruled on the admissibility of the challenged evidence, SAFCA and/or the county's ability to cut off access via North Bayou and Schoolhouse Roads was far from settled. As the trial court observed, and the parties agreed, there was "a dispute about what kind of access is presently or was available to that property from those roads," which presented a "factual determination" for the jury. The trial court did not abuse its discretion in admitting the challenged evidence, which "at least arguably ha[d] the potential of affecting the market value of the remaining property" and was necessary to refute Dhaliwal's claim that the property could be left landlocked in the future. (*Campus Crusade, supra,* 41 Cal.4th at p. 972, fn. omitted.)

The Court of Appeal, Fourth Appellate District, Division One's decisions in *Bressi* and *Coachella*, relied on by Dhaliwal, are readily distinguishable. *Bressi* stands for the unremarkable proposition that the condemning agency may not introduce evidence pertaining to a proposed, intended, or future use which contradicts the scope of the taking as set forth in the resolution of necessity. (*Bressi, supra*, 184 Cal.App.3d at p. 123.) There, the County of San Diego sought to acquire avigation easements over the defendant's property and adopted a resolution of necessity allowing such easements to be used by " 'every type of aircraft which is now in existence or which may be developed in the future for both commercial and noncommercial flights . . . .' " (*Id.* at pp. 115-116.) The Court of Appeal ruled that on retrial "the County may not offer evidence that an airport accommodating jumbo jets will not be built" because such evidence contradicts the resolution of necessity. (*Id.* at p. 123.)

17

Here, the resolution of necessity provides that SAFCA seeks to acquire a fee simple interest, a roadway easement, and a temporary construction easement for the "construction, operation, reconstruction, repair and maintenance of improvements for present and future flood control, infrastructure relocations, habitat mitigation and other purposes in connection with the Project" and provides a legal description of such land. Nothing in the resolution of necessity can be construed as allowing SAFCA or the county to cut off access via North Bayou or Schoolhouse Roads in the future, and Dhaliwal does not contend otherwise. Rather, relying on *Coachella,* he asserts that SAFCA's evidence that access was not impaired along North Bayou and Schoolhouse Roads "conflicts with the Resolution of Necessity because neither the Resolution of Necessity nor the Complaint reserved any rights to [Dhaliwal] over either North Bayou Road or Schoolhouse Road." He misconstrues *Coachella*.

In *Coachella,* the plaintiff water district condemned 30 acres of the defendant's 680-acre parcel for construction of a flood control channel. (*Coachella, supra*, 190 Cal.App.3d at p. 978.) The channel bisected the defendant's property, leaving a portion of the remainder completely landlocked. (*Ibid.*) The resolution of necessity did not expressly provide for access across the channel, and it was undisputed that the defendant's access to its remaining 530-acre parcel was contingent upon the plaintiff's discretionary approval. (*Ibid.*) The defendant argued that the trial court erred in "permitt[ing] the jury to determine whether there was a reasonable probability the [defendant] property owner would be granted access across the channel at some time in the future." (*Ibid.*) Citing *Bressi, supra,* 184 Cal.App.3d 112, the defendant urged that "evidence of the reasonable probability the Water District will grant access improperly limits the scope of the taking as defined in the resolution of necessity." (*Coachella,* at p. 978.) In dicta, the Court of Appeal observed, "Here, as in *Bressi*, the issue raised by [the defendant] is easily eliminated by formal amendment to the resolution of necessity before retrial of the valuation phase" (*ibid.*) and offered the following "guidance" to the trial

18

court on retrial: "Absent action by the Water District to amend the complaint, on remand the court should follow the principles set forth in *Bressi* in determining the evidence to be presented to the jury." (*Id.* at pp. 977, 979.)

Unlike *Coachella*, SAFCA's acquisition, as set forth in the resolution of necessity, did not leave any portion of the remainder landlocked. While Dhaliwal argued that SAFCA and/or the county could cut off his access via North Bayou and Schoolhouse Roads in the future, leaving him landlocked, as detailed above, the parties proffered conflicting evidence in support of and in opposition to Dhaliwal's motion in limine No. 2. Accordingly, SAFCA's evidence of future access did not contradict the scope of the taking, as Dhaliwal contends. Absent such a contradiction, SAFCA's failure to "carve[] out an exception" for Dhaliwal to "cross the permanent roadway easement to his property" or to "provide[] Dhaliwal with access rights" via Schoolhouse Road is of no consequence.

Finally, we turn to the evidence to which Dhaliwal *did* renew his objection at trial: (1) testimony that SAFCA had no intention of closing Schoolhouse Road; (2) a letter from SAFCA's executive director to Dhaliwal, stating, among other things, that SAFCA "does not intend, by virtue of the Pacific Terrace acquisition, to alter any rights, prescriptive or otherwise, that you or your tenants may have to use School House [*sic*] Road to access your property"; and (3) testimony that a knowledgeable buyer would not believe that SAFCA could cut off access to Schoolhouse Road because "this is a recorded subdivision map that gives all the property owners in that subdivision the right to use that road. So SAFCA has no more right to cut it off than anybody else that uses that road does." [8] We need not decide whether the trial court abused its discretion in admitting this

---

[8] In his opening brief, Dhaliwal complains that ". . . Mr. Bassett was permitted to tell the jury that in his opinion Dhaliwal might have prescriptive rights over School House [*sic*] Road, even though it would mean that Dhaliwal would have to sue his neighbors to assert

19

evidence because its admission was harmless given the undisputed evidence presented at trial that SAFCA lacked the power to cut off all access via North Bayou Road, a public road, or unilaterally cut off access to Schoolhouse Road, where it is one of several parcel owners in the subdivision.

II

The Trial Court Properly Allowed Blaesi to Critique Gimmy's Appraisal

Dhaliwal next contends that the trial court erred in permitting SAFCA's valuation expert, Blaesi, to criticize Gimmy's appraisal, opinions, and sales data because (1) section 2034.310 prohibits an expert witness from offering testimony that contradicts the opinion of an opposing party's expert, (2) SAFCA failed to disclose that Blaesi would offer an opinion concerning Gimmy's appraisal, (3) Blaesi based his criticism in part on undisclosed sales data, and (4) Blaesi testified that Gimmy "violated appraisal standards despite the trial court having already ruled that he did not violate those appraisal standards." We discern no error.

Prior to trial, SAFCA moved in limine to prohibit Gimmy from testifying about the "cost approach" method, which SAFCA claimed Gimmy used to inflate the value of the property. More particularly, SAFCA "object[ed] to [Gimmy] creating [a] fictitious three-acre homesite and using separate comparables to value that in order to get a higher value for the entire property." Dhaliwal disputed SAFCA's claim that Gimmy utilized a cost-approach method in valuing the property. According to Dhaliwal, Gimmy "valued

those rights, and that SAFCA would not try to stop Dhaliwal from trying to perfect his rights." That portion of Bassett's testimony was elicited during *Dhaliwal's* redirect examination. Dhaliwal also asserts that "[o]ver objection, Mr. Bassett testified that owners of lots in the subdivision have a legal right to use School House [*sic*] Road." Dhaliwal objected to the introduction of such evidence as calling for a legal conclusion, not as speculative, and the objection was sustained. Thereafter, Bassett was permitted to testify, over Dhaliwal's objection that the question called for a legal conclusion, that it was his understanding that owners of lots in these subdivisions have a right to use Schoolhouse Road because "it's shown on a subdivision map."

the property as a whole as if it sold to a single buyer on a single date. . . . Then after he got the value as a whole, then, . . . he allocated into different segments." Following an evidentiary hearing, the trial court denied SAFCA's motion to limit Gimmy's testimony, but noted that its ruling did not preclude SAFCA "in any way from fully exploring [its] concerns in front of the jury by way of cross-examination." At trial, over Dhaliwal's objection, Blaesi was permitted to critique Gimmy's per acre valuation of the property in the before condition, and SAFCA was allowed to introduce undisclosed sales data to rebut Gimmy's valuation of the property.

Citing section 2034.310, Dhaliwal claims that "[t]he law does not allow an expert to comment on the opinions of another expert." While Dhaliwal is correct that section 2034.310 prohibits an expert called as a witness to impeach the testimony of an expert witness offered by another party from offering "testimony that contradicts the opinion" of the other party's expert witness (§ 2034.310, subd. (b)), section 2034.310 and related provisions of the Civil Discovery Act do not apply in eminent domain proceedings (§ 2034.010 ["This chapter does not apply to exchanges of lists of experts and valuation data in eminent domain proceedings . . . ."]).

The exchange of expert witness lists and statements of valuation data in eminent domain proceedings is governed by section 1258.010 et seq. Pursuant thereto, parties are required to exchange lists of expert witnesses and statements of valuation data 90 days prior to the commencement of trial. (§§ 1258.210, 1258.220.) In addition to naming each proposed expert witness, the list of expert witnesses must identify the subject matter of his testimony. (§ 1258.240.) A party's statement of valuation need only include evidence that supports the witness's opinion. (§ 1258.260.) The penalty for failure to comply with these requirements is "exclusion of [such] evidence . . . at least from the offering party's *case-in-chief.* (§ 1258.280.)" (*County of Monterey v. W.W. Leasing Unlimited* (1980) 109 Cal.App.3d 636, 642 (*W.W. Leasing*), italics added.)

21

Section 1258.280, cited by the court in *W.W. Leasing*, provides that "upon objection of a party who has served his list of expert witnesses and statements of valuation data in compliance with section 1258.230: [¶] (a) No party required to serve a list of expert witnesses on the objecting party may call an expert witness to testify on direct examination during his *case in chief* unless the information required by Section 1258.240 for such witness is included in the list served. [¶] (b) No party required to serve statements of valuation data on the objecting party may call a witness to testify on direct examination during his *case in chief* to his opinion on any matter listed in Section 1258.250 unless a statement of valuation data for such witness was served. [¶] (c) No witness called by a party required to serve statements of valuation data on the objecting party may testify on direct examination during the *case in chief* of the party who called him to any opinion or data required to be listed in the statement of valuation data for such witness unless such opinion or data is listed in the statement served except that testimony that is merely an explanation or elaboration of data so listed is not inadmissible under this subdivision." (Italics added.)

The Law Revision Commission's Comment confirms that "[s]ection 1258.280 limits only the calling of a witness, or the presentation of testimony, during the case in chief of the party calling the witness or presenting testimony. *The section does not preclude a party from calling a witness in rebuttal or having a witness give rebuttal testimony that is otherwise proper.* [Citations.]" (Cal. Law Revision Com. com., 19 West's Ann. Code Civ. Proc. (2007 ed.) foll. § 1258.280, p. 612, italics added.) The comment further explains that "[t]he section also does not preclude a party from bringing out additional data on redirect examination where it is necessary to meet matters brought out on the cross-examination of his witness. However, the court should take care to confine a party's rebuttal case and his redirect examination of his witnesses to their purpose of meeting matters brought out during the adverse party's case or cross-examination of his witnesses. A party should not be permitted to defeat the purpose of

22

this article by reserving witnesses and valuation data for use in rebuttal where such witnesses should have been called and such valuation data presented on the direct examination during the case in chief." (*Id.* at p. 613.)

In *W.W. Leasing*, the defendant landowner attempted to introduce undisclosed comparable sales during the direct examination of its valuation expert, and the trial court sustained the plaintiff county's objection thereto. (*W.W. Leasing, supra*, 109 Cal.App.3d at p. 643.) Thereafter, the defendant attempted to persuade the trial court that the data was admissible on cross-examination of the plaintiff's valuation expert and in rebuttal. (*Ibid.*) The court allowed limited cross-examination of the plaintiff's expert as to whether he had considered the subject sales data but refused to allow testimony concerning the data in rebuttal. (*Ibid.*) In affirming the trial court's ruling, the Court of Appeal acknowledged that the exclusionary provisions of section 1258.280 apply only to the presentation of undisclosed data during the offering party's case-in-chief, but found that it was "clear from [the Law Revision Commission's] comments . . . that the concept of 'rebuttal' is not to be used in derogation of the requirement that data be exchanged pursuant to the prescribed procedures." (*W.W. Leasing,* at pp. 643-644.) The court further explained that "[i]t is well established that rebuttal evidence does not properly consist of additional opinion evidence concerning valuation. Rather, it must be concerned with and address new matter brought out by the opposing party. [Citations.]" (*Id.* at pp. 644-645.) The court concluded that the "comparables" the defendant sought to introduce constituted "improper rebuttal evidence in that they were simply additional evidence on the question of value." (*Id.* at p. 645.)

Here, we conclude that the trial court properly allowed Blaesi to testify as to why he disagreed with Gimmy's valuation, even though that subject was not identified in SAFCA's list of expert witnesses. (§§ 1258.240, 1258.280.) We likewise find that the trial court properly allowed SAFCA to introduce undisclosed sales data to rebut Gimmy's valuation. (*W.W. Leasing, supra,* 109 Cal.App.3d at p. 645.) Unlike the data at issue in

*W.W. Leasing,* the testimony and the sales data at issue were offered in response to Gimmy's valuation and not in support of Blaesi's own valuation.

Contrary to Dhaliwal's assertion, SAFCA was not required to supplement its expert witness disclosure after it determined that Blaesi would critique Gimmy's appraisal at trial. A party is required to supplement or amend its expert witness list only if it "[d]etermines to call an expert witness not included in [its] list of expert witnesses to testify *on direct examination during [its] case in chief.*" (§ 1258.270, subd. (a)(1), italics added.) Because neither the challenged testimony nor the challenged data was presented in SAFCA's case-in-chief, SAFCA was not required to supplement or amend its expert witness list to include it.[9]

Finally, neither the introduction of the challenged testimony nor the challenged sales data violated the trial court's earlier ruling denying SAFCA's motion to prohibit Gimmy from testifying about what it deemed the "cost approach" method. First, contrary to Dhaliwal's assertion, the trial court did not find, implicitly or otherwise, that Gimmy had "not violat[ed] . . . appraisal standards." The trial court simply denied SAFCA's motion and noted that SAFCA was not precluded "in any way from fully exploring [its] concerns in front of the jury by way of cross-examination." Second, Blaesi did not testify that Gimmy violated any appraisal standards. SAFCA's trial counsel asked Blaesi whether Gimmy's methodology constituted a "proper appraisal technique." Dhaliwal objected, and the objection was sustained. Thereafter, *Dhaliwal's counsel* asked Blaesi

---

[9] "Application of the concept of 'case in chief' to the presentation of evidence by the plaintiff requires particular attention. The defendant presents his case in chief first in the order of the trial. Therefore, the following presentation by the plaintiff may include evidence of two kinds; i.e., evidence comprising the case in chief of the plaintiff and evidence in rebuttal of evidence previously presented by the defendants. If the evidence offered in rebuttal is proper as such, this section does not prevent its presentation at that time." (Cal. Law Revision Com. com., 19 West's Ann. Code Civ. Proc. (2007 ed.) foll. § 1258.280, p. 613.)

24

whether he was "telling this jury that Mr. Gimmy violated appraisal practices in reaching his opinions and conclusions in this case," and Blaesi responded, "He didn't use proper appraisal methodology. It isn't proper. And violated would have to be decided by a committee or by the National Appraisal Institute Board that reviews that." Moments later, Dhaliwal's trial counsel stated: "Let's talk about why you think his appraisal violated appraisal standards. Tell me why," and Blaesi again explained, "It didn't violate a specific standard in USPAP [(Uniform Standards of Professional Appraisal Practice)], but USPAP says that you need, when you develop your appraisal, you need to follow the generally-accepted appraisal practices." When asked which practice Gimmy violated, Blaesi responded that Gimmy "created a hypothetical lot." Blaesi later clarified, "I'm saying his methodology is improper by arbitrarily carving up the property into two separate pieces, a three-acre parcel and a 128 acre parcel." Such testimony was proper and did not violate the trial court's prior ruling.

### III
### The Record on Appeal Does Not Support Dhaliwal's Claim That SAFCA's Counsel Engaged in Misconduct, and Any Potential Misconduct Did Not Warrant a Retrial

Lastly, Dhaliwal contends that SAFCA's counsel committed misconduct during closing argument by (1) commenting on Dhaliwal's absence when he knew Dhaliwal was unable to attend the trial for medical reasons, and (2) stating that "SAFCA can't afford to pay more than the fair market value of the property." We discern no misconduct on the record before us, and in any event, Dhaliwal was not prejudiced by challenged remarks.

During his closing argument, SAFCA's counsel argued, "I think it's obvious in this case that SAFCA can't afford to pay more than the fair market value of the property. If it had to pay property owners ten times the value of their property every time they acquired property for this project, it would be very difficult to build this project." SAFCA's counsel also told the jury, "I think it's offensive and insulting for the process that there's a property owner who wants you to give him more than $1 million of

25

SAFCA's money for this property west of the airport, and he doesn't even show up in the process, didn't show you the respect . . . [¶] . . . [¶] . . . to participate in the process."

" 'In conducting closing argument, attorneys for both sides have wide latitude to discuss the case. " ' " 'The right of counsel to discuss the merits of a case, both as to the law and facts, is very wide, and he has the right to state fully his views as to what the evidence shows, and as to the conclusions to be fairly drawn therefrom. The adverse party cannot complain if the reasoning be faulty and the deductions illogical, as SUCH matters are ultimately for the consideration of the jury.' " ' [Citations.] 'Counsel may vigorously argue his case and is not limited to "Chesterfieldian politeness." ' [Citations.] 'An attorney is permitted to argue all reasonable inferences from the evidence, . . .' [Citation.] 'Only the most persuasive reasons justify handcuffing attorneys in the exercise of their advocacy within the bounds of propriety.' [Citation.]" [Citation.] The same rules apply in a criminal case. [Citation.] [¶] An attorney who exceeds this wide latitude commits misconduct. For example, "[w]hile a counsel in summing up may indulge in all fair arguments in favor of his client's case, he may not assume facts not in evidence or invite the jury to speculate as to unsupported inferences." [Citation.] Nor may counsel properly make personally insulting or derogatory remarks directed at opposing counsel or impugn counsel's motives or character. [Citation.] Additional examples abound; these are but a few.' [Citation.]" (*Garcia v. ConMed Corp.* (2012) 204 Cal.App.4th 144, 147-148 (*Garcia*), fn. omitted.)

"But it is not enough for a party to show attorney misconduct. In order to justify a new trial, the party must demonstrate that the misconduct was prejudicial. [Citation.] As to this issue, a reviewing court makes 'an independent determination as to whether the error was prejudicial.' [Citation.] It 'must determine whether it is reasonably probable [that the appellant] would have achieved a more favorable result in the absence of that portion of [attorney conduct] now challenged.' [Citation.] It must examine 'the entire case, including the evidence adduced, the instructions delivered to the jury, and the

26

entirety of [counsel's] argument,' in determining whether misconduct occurred and whether it was sufficiently egregious to cause prejudice.  [Citation.]  'Each case must ultimately rest upon a court's view of the overall record, taking into account such factors, inter alia, as the nature and seriousness of the remarks and misconduct, the general atmosphere, including the judge's control, of the trial, the likelihood of prejudicing the jury, and the efficacy of objection or admonition under all the circumstances.'  [Citation.] '[I]t is only the record as a whole, and not specific phrases out of context, that can reveal the nature and effect of such tactics.'  [Citation.]"  (*Garcia*, *supra*, 204 Cal.App.4th at p. 149.)

As a preliminary matter, Dhaliwal failed to object to the statement concerning SAFCA's inability to pay above-market value for the property, and thus, forfeited his misconduct claim as to that remark.  (*Garcia, supra,* 204 Cal.App.4th at p. 148.)  In any event, the remark did not constitute misconduct.  It is well established that " '[t]he term "just compensation" means "just" not only to the party whose property is taken for public use but also "just" to the public which is to pay for it.' "  (*People ex rel. Department of Public Works v. Pera* (1961) 190 Cal.App.2d 497, 499; see also *Los Angeles County Metropolitan Transportation Authority v. Continental Development Corp.* (1997) 16 Cal.4th 694, 716 (*Continental*).)  In other words, "taxpayers should not be required to pay more than reasonably necessary for public works projects."  (*Continental*, *supra*, 16 Cal.4th at p. 716.)  The challenged remark is consistent with this general principle and did not constitute misconduct.

Turning to the remark about Dhaliwal's absence, Dhaliwal claims this remark constituted misconduct because SAFCA's counsel knew that Dhaliwal could not attend the trial because he was undergoing surgery for cancer.  As Dhaliwal concedes in his reply brief, there is nothing in the record to support his assertion that SAFCA's counsel knew that Dhaliwal could not attend the trial because was undergoing surgery, and SAFCA denies that its trial counsel had any such knowledge at the time he made the

challenged remark. Assuming without deciding that the remark nevertheless amounted to a personal insult rising to the level of misconduct, when viewed in the context of the entire case, we have no trouble concluding that Dhaliwal would not have achieved a more favorable result had the remark not been made. (*Garcia*, *supra*, 204 Cal.App.4th at pp. 148-149.) Dhaliwal's objection to the remark and motion to strike it were "sustained," the remark was fleeting, and it was not particularly serious.

## DISPOSITION

The judgment is affirmed. SAFCA shall recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a).)


    BLEASE    , Acting P. J.


We concur:


    NICHOLSON    , J.


    DUARTE    , J.

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)


| | |
|---|---|
| SACRAMENTO AREA FLOOD CONTROL AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> BRINDERJIT S. DHALIWAL, as Co-executor, etc., et al., <br><br> Defendants and Appellants. | C073098 <br><br> (Super. Ct. No. 34-2010-0070156) <br><br> ORDER MODIFYING OPINION AND CERTIFYING OPINION FOR PUBLICATION <br><br> [CHANGE IN JUDGMENT] |


APPEAL from a judgment of the Superior Court of Sacramento County, Steven H. Rodda, Judge. (Retired judge of the Sacramento Super. Ct., assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.) Affirmed.

Jenny & Jenny and Scott E. Jenny for Defendants and Appellants.

Shute, Mihaly & Weinberger, Andrew W. Schwartz, Catherine C. Engberg, and Erica A. Maharg for Plaintiff and Respondent.


1

THE COURT:

It is ordered that the opinion filed herein on April 21, 2015, be modified as follows:

On the last page, under the heading "Disposition", the last two sentences beginning with "SAFCA shall recover" are deleted and the following two sentences are inserted in their place:

Dhaliwal shall recover his costs on appeal.  (Code Civ. Proc., § 1268.720.) This modification changes the judgment.

The opinion in the above-entitled matter filed on April 21, 2015, was not certified for publication in the Official Reports.  For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.


BY THE COURT:


   BLEASE            , Acting P. J.


   NICHOLSON       , J.


   DUARTE           , J.